Filed 1/30/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S186661 |
| v. | ) | |
| | ) | Ct.App. 4/1 D054613 |
| SETH CRAVENS, | ) | |
| | ) | San Diego County |
| Defendant and Appellant. | ) | Super. Ct. No. SCD206917 |
| _____ | ) | |

The issue presented in this case is whether there is sufficient evidence to support defendant Seth Cravens's conviction of second degree murder under a theory of implied malice. The Court of Appeal held there was not. After reviewing the entire record, we conclude the evidence is sufficient and therefore reverse the Court of Appeal.

## BACKGROUND

Defendant was convicted by a jury of various crimes against a number of victims: one count of making a criminal threat (Pen. Code, § 422); one count of battery (§ 242); four counts of assault by means of force likely to produce great bodily injury, one of which was enhanced because defendant personally inflicted great bodily injury (§§ 245, subd. (a)(1), 12022.7, subd. (a)); and one count of second degree murder (§ 187, subd. (a)). He was sentenced to 20 years to life. Because the issues in this proceeding concern only the murder conviction, we limit our factual recitation to the circumstances of that crime.

1

The principal characters, including defendant, then 21 years old, and the decedent, Emery Kauanui, 24, were all at the La Jolla Brew House on the night of May 23, 2007. Kauanui, a professional surfer, was sitting at the bar and drinking with some friends while he waited for his girlfriend, Jennifer Grosso, to arrive. Grosso left work late and got to the bar between 11:00 and 11:30 p.m. to find her boyfriend in a "[v]ery cheerful" mood. About half an hour later, defendant arrived with his friends, all former football teammates from La Jolla High School: Eric House, Matthew Yanke, Orlando Osuna, and Henri "Hank" Hendricks. Grosso went up to say "hi" to defendant and gave him a big hug. Defendant and his friends approached the bar where Kauanui was seated and became "like . . . a big group" where people were standing close to each other, "kind of elbow to elbow."

Sometime later, Kauanui and Grosso started dancing next to the tables. Kauanui had a full drink in his hand. A little bit of it spilled accidentally on Eric House, who was close by. House complained, "You better watch out, you know. I can knock you out with one punch." Kauanui replied, "[W]hat? Like, what did you say?" Defendant stepped in and said, "Yeah. You know Eric could beat your ass. Like don't say anything." The mood became more aggressive, less joking, but Kauanui kept asking, "[D]o you guys have like a problem?" In an effort to defuse the worsening situation, the bar manager, Ron Troyano, intervened and eventually suggested that Kauanui leave. Troyano explained that Kauanui was not being kicked out but that it was easier to remove Kauanui than to evict defendant, who was there with many friends. When Kauanui, who appeared calm, expressed a fear of being "jumped" outside, Troyano said he would escort Kauanui to his car. Defendant attempted to follow them as they left the bar, but Troyano told him twice to stop and wait. While Troyano was still at the vehicle, Grosso (who had been settling the tab) came out and said she would drive Kauanui home. Grosso had consumed less than one drink; Kauanui had consumed three or four.

2

Defendant, House, Yanke, Osuna, and Hendricks eventually came outside to continue the argument, but Grosso and Kauanui drove off in Kauanui's car.

Kauanui was on the phone as Grosso pulled up to Kauanui's house a couple minutes later. She heard him say, "If you want to fight me one on one, I'll fight you." She yelled at him to get off the phone. He did so, and they went inside together. She scolded him for acting in an immature manner. He apologized, admitted the situation was "dumb," and "completely went back into a just really calm behavior." Satisfied that he was contrite, Grosso felt able to walk back towards the bar to retrieve her own car, which was parked illegally in a nearby lot. He made her promise to come back and said he needed her.

Grosso started out by walking but then realized the risk in being out alone at that time of night and jogged the rest of the way. Unable to shake a bad feeling about what might happen, she picked up the pace and, as she was running down the alley near the bar, heard defendant say, "Let's go fuck him up. . . . [D]on't call him. Don't call him. I know where he lives. Let's go fuck him up." She screamed out defendant's name, but he and his friends sped past in a black Ford Explorer, ignoring her. She immediately tried to call Kauanui, but he did not answer. She ducked her head into the Brew House to tell her friends that Kauanui was going to get jumped. Then she ran to her car and raced back to the house. She figured she was one to two minutes behind defendant and his friends. Meanwhile, inside the Ford Explorer, defendant was egging on and encouraging House to fight Kauanui. The fight began promptly after defendant and the others exited the Explorer.

There was conflicting testimony as to whether the fight was truly a one-on-one battle between Kauanui and House or whether Kauanui was instead the victim of a group beating.

3

Neighbor Erica Wortham was awakened by loud voices out in the street. She saw four people approaching Kauanui with the apparent intention of fighting. As she left her balcony to call 911, she heard "a lot of blows, a lot of hitting. Like a maul. . . . [L]ike several people on top of each other hitting. . . . [R]eally awful. Like a soundtrack out of a movie." The 911 call awakened her husband, Philip Baltazar, who saw what looked like a rugby scrum: "What I saw were four guys on top of one guy, and four guys were either kicking or punching or elbowing or kneeing. And as I said, you know, it was moving. . . . [I]t was like a scrum line. And they were just whaling—four guys were just whaling, you know, on someone who turned out to be Emery."

Dylan Eckardt, who was friends with Kauanui and was driving towards Kauanui's house after receiving a frantic phone call from his friend that there was going to be a fight, saw a few men circled around Kauanui, kicking or hitting him while he was on the ground. Eckardt's girlfriend, Karen Loftus, saw four or five people punching or kicking Kauanui while he was on the ground.

On the other hand, defendant's friends and former teammates Matthew Yanke and Hank Hendricks claimed that the fight was between House and Kauanui alone. Yanke testified that Kauanui came out swinging, but that House ducked, tackled Kauanui around his legs, and brought him down to the ground. Hendricks confirmed that House tackled Kauanui and brought him to the ground. Yanke described a wrestling match, in which House and Kauanui took turns being on top. Hendricks said that House initially had the upper hand but that Kauanui later had the advantage.

In any case, House had the advantage when Grosso drove up. House was straddling Kauanui and punching him with both fists. Kauanui had one arm wrapped around House's shoulder, as though attempting a headlock, but it was not working. Grosso honked her horn to wake up the neighbors, but the beating

continued.  Kauanui was not yelling, he was not throwing any punches, and "[t]here was no strength being exerted from his body."  Grosso ran up and kicked House in an effort to break up the fight, but House did not react to her other than to tell his friends to "get her the fuck off of me."  Hendricks pulled Grosso away, but she continued to scream out their names and vow that they would go to jail. When this still failed to stop to the fight, she started to kick at the headlights and pound on the body of the Ford Explorer.  The group then started talking amongst themselves, calling her "crazy" and suggesting it was time to leave.

Meanwhile, Kauanui had managed to get loose, but he was unsteady and could not walk straight.  Loftus was surprised he was able to get up at all. Kauanui asked defendant, "How the fuck are you going to jump me at my house?" and raised his palms upward, as though asking "what happened?"  He was not behaving in an aggressive manner.  But defendant nonetheless "came flying out" and "coldcocked" Kauanui.  At the time of the blow, defendant was on the curb and Kauanui was at street level.  Grosso, Eckardt, and Hendricks opined that Kauanui was unconscious from the blow before he hit the ground.  The punch was described by witnesses as "extremely hard" and "one of the hardest punches I've ever seen thrown."  Eckardt added that "[i]t was a knockout. . . .  [A]ll you heard was like boom, like, from his head hitting the concrete.  Nothing else hit first.  It was like a side punch Mr.—Emery didn't see."  Even the neighbors could hear the sound of his skull hitting the ground.  A pool of blood started to stream from the back of Kauanui's head.  Grosso thought "he was dead right then and there." Hendricks checked Kauanui's pulse to determine whether he was still alive.

When Grosso asked defendant why he did this, defendant had no reaction. Instead he said to his friends, "Come on.  Let's go."  Yanke drove defendant away in the Ford Explorer.  Grosso testified that the Explorer drove away quickly. Hendricks and Osuna left on foot.  House refused to leave; he was on all fours on

the ground looking for his tooth. (At the time police took him into custody, House had suffered a laceration above his right eye and a missing tooth, as well as abrasions to his knees and swollen knuckles.) An ambulance took Kauanui to the hospital. Kauanui had a blood-alcohol level of .17 percent when he was admitted, and his blood contained traces of marijuana.

At the hospital, doctors performed a craniotomy (an operation to open the skull) and a craniectomy (removal of part of the skull to release pressure). However, the pressure on Kauanui's brain remained high, despite maximal therapy, surgeries, and medications. The brain injury continued to worsen, and Kauanui was pronounced brain dead on May 28, 2007.

Christina Stanley, the forensic pathologist who performed the autopsy, described a skull fracture that radiated down into the base of the skull, spanned 15 centimeters across multiple bones, and ended up quite far forward on Kauanui's head, just behind the eye sockets. The entire left side of his brain was swollen and had shifted over prior to surgery, cutting off one of the blood vessels supplying the right half of the brain. According to her testimony, the more swelling there is, the less blood flow there is, which leads to more swelling—and, over a period of days, to brain death. Kauanui's injuries were consistent with being punched by someone coming off a greater height and propelling him onto a concrete surface. In Stanley's experience, the severe injuries Kauanui suffered—a fracture through the bony structures containing the ear canal, which are one of the thickest areas of the skull—can be seen in victims of motor vehicle crashes or in those struck in the head with a hammer, baseball bat, or tire iron. Kauanui's other injuries (abrasions and bruises on his arms, knees, shoulder and back) were not life threatening and were consistent with an assault. The cause of death was blunt-force head injuries.

Yanke, testifying for the defense, claimed that Kauanui "uppercut" House several times while House was repeatedly saying "I'm done." On the other hand,

6

Hendricks, another defense witness, recalled that House said, "You got me. You got me. It's over. It's over," while he and Kauanui were holding each other like boxers in the 15th round. According to Yanke, defendant had to push Kauanui away and said, "Get off him. He's done. He's done. Get off him." Both Yanke and Hendricks claimed that after Kauanui stood up, he charged towards defendant and started speaking in an aggressive manner. Yanke recalled that defendant, who is right handed, punched Kauanui with his left hand, and said that defendant looked very shocked and worried after Kauanui fell. However, once they got to Yanke's house, defendant bragged about knocking out Kauanui with his left hand. A few hours later, after Nur Kitmitto called defendant to describe Kauanui's condition ("he didn't look good") and to warn him that the police were there and "it's a big deal," defendant insisted he "was willing to go back at Emery again." The next morning, when Kristen Link called to ask whether defendant had been in a fight with Kauanui, defendant bragged, "I would hardly call it a fight. I punched him out." During a telephone conversation that same morning between Hendricks and Nicole Sparks about the fight, defendant laughed and said, "We put him to sleep."

Yanke claimed he and defendant drove away slowly after Kauanui fell, but he admitted crashing the Explorer into a retaining wall on the drive home.

Hendricks admitted that defendant was bigger, taller, and weighed quite a bit more than Kauanui. At the time of the murder, Kauanui was five feet 10 inches tall and weighed 181 pounds. Defendant stood 6 feet and weighed 240 pounds. The top of defendant's left hand appeared swollen at the time of his arrest.

Defendant was convicted of second degree murder. In prior proceedings, Eric House, Matthew Yanke, and Orlando Osuna pleaded guilty to involuntary manslaughter. Hank Hendricks pleaded guilty to being accessory to murder.

In an unpublished opinion, the Court of Appeal affirmed the judgment except for the second degree murder conviction, which it ordered reduced to voluntary manslaughter because of insufficient evidence of implied malice. The court focused solely on the subjective component of implied malice and reasoned that "[a] single fist blow to the head does not involve a high probability of death simply because it occurs on pavement, and awareness that the recipient of such a blow might fall and hit his or her head on the pavement is merely awareness of a risk of serious bodily injury, not conscious disregard for life."

We granted the Attorney General's petition for review.

## DISCUSSION

Murder is the unlawful killing of a human being or a fetus "with malice aforethought." (Pen. Code, § 187, subd. (a).) Defendant was convicted of second degree murder, which is "the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (*People v. Knoller* (2007) 41 Cal.4th 139, 151.) Malice may be either express (as when a defendant manifests a deliberate intention to take away the life of a fellow creature) or implied. (*People v. Blakeley* (2000) 23 Cal.4th 82, 87.) "Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another . . . ." (*Knoller*, *supra*, 41 Cal.4th at p. 143.)

The Court of Appeal agreed with defendant that the evidence of implied malice was insufficient and reversed his conviction for second degree murder. Our task is clear. "On appeal we review the whole record in the light most

8

favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320.)  The standard of review is the same in cases in which the People rely mainly on circumstantial evidence.  (*People v. Bean* (1988) 46 Cal.3d 919, 932.)  'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.  " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]'  (*Id.* at pp. 932-933.)"  (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793; see also *Cavazos v. Smith* (2011) ___ U.S. ___ , ___ [132 S.Ct. 2, 3] (per curiam).)  The conviction shall stand "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' "  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Thus, we must determine whether there is sufficient evidence to satisfy both the physical and the mental components of implied malice, the physical component being " 'the performance of "an act, the natural consequences of which are dangerous to life," ' " and the mental component being " 'the requirement that the defendant "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." ' "  (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.)  We conclude that both components are satisfied here.

This state has long recognized "that an assault with the fist . . . may be made in such a manner and under such circumstances as to make the killing

9

murder." (*People v. Munn* (1884) 65 Cal. 211, 212.)  However, "if the blows causing death are inflicted with the fist, and there are no aggravating circumstances, the law will not raise the implication of malice aforethought, which must exist to make the crime murder." (*Id.* at p. 213.)  Based on our review of the record, we find sufficient evidence that the manner of the assault and the circumstances under which it was made rendered the natural consequences of defendant's conduct dangerous to life.

First, the record shows that defendant targeted a smaller and shorter victim who was intoxicated, exhausted, and vulnerable.  Defendant points out that Kauanui was a healthy young male and a professional athlete, but a reasonable jury could conclude that those attributes were of little assistance to him at the time of the murder.  Kauanui's blood-alcohol level was .17 percent.  Moreover, Kauanui was visibly worn out from the prior altercation, regardless of whether he had been repeatedly punched and kicked by Eric House alone or by House along with several of House's friends.  Witnesses testified that just before defendant attacked him, Kauanui was unsteady and unable to walk straight.  Before Kauanui managed to stand up, Jennifer Grosso observed that "[t]here was no strength being exerted" from her boyfriend's body, and Karen Loftus was surprised he was even able to get up.  Although unmentioned in the Court of Appeal's analysis of the sufficiency of the evidence supporting the judgment, those were the relevant facts available to the jury—not Kauanui's general physical condition when rested and sober—at the time defendant swung hard against a fatigued and intoxicated victim who was two inches shorter and 60 pounds lighter.  (See *People v. Mears* (1956) 142 Cal.App.2d 198, 200-202.)

And it was a very hard punch.  Witnesses described it as "extremely hard" and "one of the hardest punches I've ever seen thrown."  The punch was hard enough to knock Kauanui unconscious, despite his youth and fitness, even before

10

he hit the ground.  The absence of facial markings from the blow itself did not preclude the jury from considering the other evidence concerning the severity of the blow.  Indeed, defendant's punch was hard enough to force Kauanui's head to hit the pavement with an audible cracking sound that even the neighbors could hear, causing skull fractures the forensic pathologist likened to the force experienced in a motor vehicle crash or from being struck in the head with a hammer, baseball bat, or tire iron.  Under these circumstances, defendant's apparent belief that he could have inflicted even *more* damage had he hit Kauanui with his right hand is hardly exculpatory.

Moreover, the jury could reasonably have found that defendant secured himself every advantage to ensure that he could inflict the greatest possible injury on his victim.  Not only was defendant bigger and taller, but he gained extra inches of height for his punch by standing on the curb while Kauanui was at street level.  Defendant's conduct thus guaranteed that Kauanui would fall on a very hard surface, such as the pavement or the concrete curb.  "The consequences which would follow a fall upon a concrete walk must have been known to [defendant]."  (*People v. Efstathiou* (1941) 47 Cal.App.2d 441, 443 [upholding a verdict of second degree murder]; see also *People v. Alexander* (1923) 62 Cal.App. 306, 308-309 [same].)

Perhaps worst of all, defendant decked Kauanui with a sucker punch.  The jury could reasonably have found that at the time defendant attacked, Kauanui posed no threat and was not behaving in an aggressive manner.  Nonetheless, defendant "came flying out" without warning and "coldcocked" Kauanui.  That defendant used a sucker punch here—and, thus, that defendant intended to catch Kauanui at his most vulnerable—was corroborated by his use of sucker punches in prior incidents, each of which the jury was allowed to consider as evidence of a common plan or scheme.  (See *People v. Balcom* (1994) 7 Cal.4th 414, 423-424.)

11

The Court of Appeal not only failed to acknowledge that the fatal blow here was a sucker punch (or that it was inflicted with enough force to knock Kauanui unconscious before he even hit the pavement), but failed as well to grapple with the evidence tending to show defendant's pattern of using sucker punches to his advantage.

In October 2005, defendant and one or two other people approached Eric Pardee outside a party. They were on the curb; Pardee was at street level. Pardee did not remember any arguing or even talking before defendant jumped off the curb and delivered a sucker punch that knocked Pardee, who was six feet tall and weighed 155 pounds, unconscious and broke his cheekbone in multiple places.

At another party on December 31, 2005, defendant bumped into Ryan Granger and spilled a drink on Granger. When Granger asked, "Dude, what's up?," defendant threatened to instigate a fight and demanded *Granger* apologize. Granger tried to ignore defendant and turned his face away, but defendant sucker punched him from the side and knocked him down. Matthew Yanke then told Granger, who was five feet 10 inches tall and around 170 pounds, "You better get the hell out of here."

In August 2006, Shannon O'Neill sought to stop a fistfight between defendant and her boyfriend, Christopher Jarrett, at Windansea Beach. Defendant hit her in the face with a closed fist and knocked her into the sand.

And on May 8, 2007, about two weeks before the murder, defendant sucker punched Michael Johnson, without any warning whatsoever, outside The Shack Bar and Grill. Christopher Horning, Johnson's coworker, testified that defendant stepped right up to Johnson and knocked him right in the face with "as much force as you can possibly give a person." Horning wanted to stop the violence, but one of defendant's companions said, "[Y]ou don't want to get hurt. Stay out of it." Johnson stood there in a daze and said nothing. Defendant taunted the disoriented

12

Johnson and then punched him again, "[j]ust full out hit him as hard as you can." Johnson fell to the ground. His nose was broken at an angle.

Considering the totality of the circumstances, including those facts omitted from the Court of Appeal's analysis of the record, the jury could reasonably find that defendant's act of violence was predictably dangerous to human life. We categorically reject defendant's blithe assertion that the "natural consequence" of his conduct was merely "a sore jaw." The jury was not compelled to credit the defense version that this was a fistfight between two evenly matched adversaries. Rather, the record supported the jury's finding that Emery Kauanui was impaired, exhausted, and completely unaware that he needed to defend himself against a forceful punch, let alone a forceful punch to the head. Defendant was not merely bigger and taller than his hapless victim, but his sucker punch emerged from the greater height of the curb after a running start, landed with unprecedented force according to those at the scene, and launched Kauanui head first to the pavement with a sickening crack that was loud enough to be heard in the neighbors' homes. The jury was not compelled to deem Kauanui's death "a freak result," as defendant insists, nor would affirmance of the murder verdict under these circumstances mean that "every fist fight or punch to the head that occurs on pavement, or other similarly hard surface, would involve a conscious disregard for human life," as the Court of Appeal contended. The record belies their shared assumption that this punch was at all ordinary. Instead, as the jury found, it was an extremely powerful blow to the head calculated to catch the impaired victim off guard, without any opportunity for the victim to protect his head, and thereby deliver the victim directly and rapidly at his most vulnerable to a most unforgiving surface. (See *People v. Alexander*, *supra*, 62 Cal.App. at pp. 308-309 [upholding a verdict of second degree murder where defendant landed an unprovoked single blow to the victim's head and, by holding the victim's hand, would have known

13

that "fatal injuries would result from the striking of his head upon the hard pavement"].)

Defendant, like the Court of Appeal, relies on *People v. Spring* (1984) 153 Cal.App.3d 1199. Spring, like defendant, punched his victim only once, but there the similarities end. The force of Spring's punch "was too weak" to knock the elderly victim off his feet or render him unconscious (*id*. at p. 1205) and caused only "slight outward damage" (*id*. at p. 1206). The *Spring* court thus deemed the circumstances "similar" to *Munn*, where an expert had testified that the blow would not ordinarily have caused death but that it " 'happened by chance to fall upon that portion of the skull which is the thinnest and most easily fractured.' " (*Spring*, *supra*, 153 Cal.App.3d at p. 1204.) Although death was neither likely nor foreseeable in *Spring*, the same cannot be said here.

The record also supports the jury's finding of the mental component of implied malice. Of course, the jury was entitled to infer defendant's subjective awareness that his conduct endangered Kauanui's life from the circumstances of the attack alone, the natural consequences of which were dangerous to human life. (*People v. Gray* (2005) 37 Cal.4th 168, 218.) But defendant's behavior before and after the fight further demonstrated that this was not, as defendant suggests, a simple fistfight between friends. Before he arrived at Kauanui's house, defendant was egging on Eric House and encouraging him to fight Kauanui, while dissuading others from sharing these plans with Kauanui. Then, having knocked Kauanui unconscious and with his head split open on the ground, defendant took no steps to ascertain Kauanui's condition or to secure emergency assistance. Instead, he bragged about his own prowess, laughed and joked about Kauanui's condition (which "didn't look good"), and expressed a willingness "to come back at him if he had to." These facts, too, bolstered the finding of implied malice. (*People v. Ogg* (1958) 159 Cal.App.2d 38, 51.)

14

For these reasons, we conclude that the evidence of defendant's conduct and his mental state satisfied the elements of implied malice. The Court of Appeal erred in finding otherwise.

### DISPOSITION

The judgment of the Court of Appeal is reversed to the extent it ordered modification of the second degree murder conviction and is otherwise affirmed.

BAXTER, J.


WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.

15

**CONCURRING OPINION BY LIU, J.**


I write separately to comment on the relevant standard for implied malice, which is statutorily defined in relevant part as "when the circumstances attending the killing show an abandoned and malignant heart." (Pen. Code, § 188.)

We have previously acknowledged two lines of decisions that attempt to delineate the objective and subjective components of implied malice. The first derives from Justice Traynor's concurring opinion in *People v. Thomas* (1953) 41 Cal.2d 470, which said implied malice is shown when "the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death." (*Id*. at p. 480, conc. opn. of Traynor, J.) The second line derives from *People v. Phillips* (1966) 64 Cal.2d 574 (overruled on another ground in *People v. Flood* (1998) 18 Cal.4th 470, 490, fn. 12), which described implied malice murder as a " 'killing [which] proximately resulted from an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*Phillips, supra,* 64 Cal.2d at p. 587.)

Our prior cases have cited both of these tests, and we have held "that the two definitions of implied malice which had evolved from the foregoing cases actually articulated one and the same standard." (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 104; see also *People v. Knoller* (2007) 41 Cal.4th 139, 152; *People v. Dellinger* (1989) 49 Cal.3d 1212, 1219; *People v. Watson* (1981) 30 Cal.3d 290, 300.) Although we have

suggested that the *Phillips* formulation of the *subjective* component of implied malice ("conscious disregard for life") is preferable to the *Thomas* formulation ("wanton disregard for human life") for purposes of instructing a jury (see *Dellinger, supra,* 49 Cal.3d at p. 1221), we have never disavowed the *Thomas* formulation of implied malice, particularly with respect to the objective component. (See *Knoller, supra,* 41 Cal.4th at p. 157 [discussing objective test under *Thomas*].)

Under *Thomas,* the objective component of implied malice requires "an act that involves a high degree of probability that it will result in death." (*Thomas, supra,* 41 Cal.2d at p. 480, conc. opn. of Traynor, J.) This test recognizes that the ultimate inquiry involves a determination of probability: Although an act that will certainly lead to death is not required, the probability of death from the act must be more than remote or merely possible. The *Thomas* test strikes that balance by requiring a "high degree of probability" of death.

The Court of Appeal, citing *Thomas*'s formulation of the objective component, found that under the circumstances here, defendant's single punch did not involve a "high degree of probability" that the victim would *die* rather than simply suffer serious bodily injury. In the context of battery, the Legislature has defined "serious bodily injury" to mean "a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement." (Pen. Code, § 243, subd. (f)(4).) In this case, the pathologist who performed the autopsy saw no bruising or other injury on Kauanui's face, and she could not tell "which side of his face [he was] punched on." Other than the skull fracture, the pathologist described the victim's injuries as "medically insignificant" and "medically trivial." There is no question the victim's skull hit the pavement with lethal force, but it is questionable whether there was a "high degree of probability" that defendant's single punch would produce that unfortunate result.

2

Today's opinion does not mention *Thomas*'s formulation of the objective component. The court cites only the *Phillips* formulation in "find[ing] sufficient evidence that the manner of the assault and the circumstances under which it was made rendered the natural consequences of defendant's conduct dangerous to life." (Maj. opn., *ante*, at p. 10; see *id.* at p. 13 ["the jury could reasonably find that defendant's act of violence was predictably dangerous to human life"]). The court's omission of the *Thomas* formulation continues the erosion of that test that began in the context of the second degree felony murder rule. In *People v. Patterson* (1989) 49 Cal.3d 615, we adopted the *Thomas* formulation as the relevant inquiry in deciding whether an offense constituted an "inherently dangerous felony" upon which second degree felony murder liability could be predicated. (*Id.* at p 627.) We applied that test in *People v. Hansen* (1994) 9 Cal.4th 300 in determining that shooting at an inhabited dwelling "involves a high probability that death will result and therefore is an inherently dangerous felony . . . for purposes of the second degree felony-murder doctrine." (*Id.* at p. 309.) However, our later second degree felony murder cases have omitted the *Thomas* test, even as they continued to cite *Patterson* favorably. (See *People v. Chun* (2009) 45 Cal.4th 1172, 1182 [inherently dangerous felony is " ' "an act, the natural consequences of which are dangerous to life" [citation],' " citing *Patterson*, 49 Cal.3d at p. 626]; *People v. Howard* (2005) 34 Cal.4th 1129, 1135 [inherently dangerous felony is one that by its nature involves a " 'substantial risk that someone will be killed,' " quoting *People v. Burroughs* (1984) 35 Cal.3d 824, 833].)

Because we have said that the *Thomas* and *Phillips* formulations are equivalent (see *Knoller*, *supra*, 41 Cal.4th at p. 152), the court is not compelled by precedent to mention *Thomas*. However, by omitting the *Thomas* test when defendant and the Court of Appeal have clearly relied on it, today's opinion suggests (but does not hold) that the *Phillips* formulation matters in a close case such as this. If *Thomas*'s "high degree of probability" test is to become disfavored in our doctrine, I prefer we consider and resolve

3

the issue explicitly — if not in this case, then in a future case — instead of leaving it to mere implication.  Since the issue is not specifically considered here, I express no view on *Thomas*'s continued validity.

The *Phillips* formulation still requires some probabilistic assessment of when an act becomes sufficiently "dangerous" to life.  In *Knoller*, we said that the subjective component of the *Phillips* test, which requires "conscious disregard of the danger to human life," is not satisfied by "conscious disregard of the risk of serious bodily injury." (*Knoller, supra,* 41 Cal.4th at p. 156.)  Because *Phillips* uses the same "dangerous to life" nomenclature in stating the objective component of implied malice, an act "dangerous to life" must be one that presents more than a risk of serious bodily injury.  For substantially the reasons stated by the court's opinion, I agree the circumstances here fall just within the outer bounds of conduct sufficiently dangerous to satisfy the *Phillips* test of " 'an act, the natural consequences of which are dangerous to life.' " (*Phillips*, *supra*, 64 Cal.2d at p. 587.)

LIU, J.

**DISSENTING OPINION BY KENNARD, J.**

Someone who unlawfully kills a person without deliberately intending to do so is guilty of second degree murder if the act resulting in death is done with implied malice, which means the deliberate performance of an act whose natural consequences are dangerous to life, with knowledge that the act endangers the life of another.

Here, without warning, a right-handed defendant used his left hand to punch a man once in the head, causing the man to hit his head on the pavement, fatally injuring him. That incident led to a murder charge. Although the prosecution's theory at trial was second degree murder, it presented no evidence to satisfy either the requirement that the natural consequences of the punch included death, or the requirement that defendant knew the act was dangerous to life. A jury nonetheless convicted defendant of second degree murder. A unanimous Court of Appeal panel concluded there was insufficient evidence of implied malice to support the second degree murder conviction. Unlike today's majority, I would uphold that conclusion.

**I**

On the night of May 23, 2007, while at a bar, Emery Kauanui had an argument with defendant Seth Cravens. To prevent a fight, a bar manager asked Kauanui to leave. Kauanui then left for his nearby home.

About an hour later, defendant said, "Let's go fuck him up," and he and four friends drove to Kauanui's house. On the street outside the house, one or

1

more of defendant's friends began to fight Kauanui. When Kauanui's girlfriend arrived, she saw Kauanui lying on his back and defendant's friend, Eric House, straddling and punching him. Kauanui managed to get free. As he stood up, he looked unsteady. (He had a blood-alcohol level of 0.17 percent and traces of marijuana in his blood.)

Kauanui walked over to defendant and asked, "How the fuck are you going to jump me at my house?" Defendant, who was standing on the curb, and who is right-handed, stepped forward and used his left hand to hit Kauanui in the head with a sudden blow. (Defendant was six feet tall and weighed 240 pounds; Kauanui was five feet 10 inches tall and 180 pounds.) Kauanui, who was standing below defendant in the street, fell backwards. The fall fractured his skull and triggered swelling in his brain that, four days later, led to his death.

A jury convicted defendant of second degree murder, as well as six prior assaultive crimes involving different persons. On defendant's appeal, a unanimous panel concluded there was insufficient evidence of implied malice to support the second degree murder conviction, which the court reduced to voluntary manslaughter. This court granted the Attorney General's petition for review.

## II

Murder is an unlawful killing with malice aforethought. (Pen. Code, § 187, subd. (a).) Malice can be express or implied. (*Id.*, § 188.) If malice is implied, the murder is of the second degree. (*Id.*, § 189.)

Implied malice has both an objective and a subjective test. The *objective* test requires " ' "an act, the natural consequences of which are dangerous to life." ' " (*People v. Knoller* (2007) 41 Cal.4th 139, 143 (*Knoller*), quoting *People v. Phillips* (1966) 64 Cal.2d 574, 587.) This means an act involving " 'a high degree of probability that it will result in death.' " (*Knoller*, *supra*, at p. 152.) The *subjective* test requires that the act be performed " ' "by a person who knows that his

2

conduct endangers the life of another." ' " (*Id.* at p. 143.)  Below, I discuss why this case does not meet either the objective or the subjective test for implied malice.

### A.  Objective Test

As the majority correctly notes, " 'if the blows causing death are inflicted with the fist, and there are no aggravating circumstances, the law will not raise the implication of malice . . . .' " (Maj. opn., *ante*, at p. 10, quoting *People v. Munn* (1884) 65 Cal. 211, 213.)  Here, according to the majority, aggravating circumstances surrounded defendant's single blow with the fist to Kauanui's head (maj. opn., *ante*, at p. 13), a topic I discuss below.

The majority points out that defendant delivered the punch while he was standing on the curb and Kauanui was standing in the street.  (Maj. opn., *ante*, at p. 11.)  Defendant did so, the majority states, "to ensure that he could inflict the greatest possible injury" by gaining "extra inches of height for his punch."  (*Ibid.*)  But even if defendant so intended, that intent is, in determining implied malice for murder, irrelevant to the *objective* question whether defendant's single blow involved a " 'a high degree of probability' " of death.  (*Knoller*, *supra*, 41 Cal.4th at p. 152.)  At trial the prosecution presented no evidence that defendant's position on the curb increased the probability that his punch would kill Kauanui.

The majority also views as an aggravating circumstance defendant's prior conduct of hitting four other people with sudden, unexpected blows.  (Maj. opn., *ante*, at pp. 11–13.)  But these past assaults, none of which led to a fatal injury, do not tend to establish that in *this* case the blow involved a high probability of death.

The majority further observes that defendant's past use of sudden, unexpected punches "corroborated" that he "used a sucker punch here," which, the majority asserts, shows that defendant "intended to catch Kauanui at his most vulnerable."  (Maj. opn., *ante*, at p. 11.)  That undisputed fact has no bearing, however, on whether defendant's single blow involved a high probability of killing

3

Kauanui. As noted earlier, the objective test for implied malice requires " ' "an act, the natural consequences of which are dangerous to life." ' " (*Knoller*, *supra*, 41 Cal.4th at p. 152.) Here, the prosecution presented no evidence at trial that Kauanui's *death* by falling and hitting his head on the pavement was a *natural* consequence of the single unexpected blow, meaning that the blow had a high probability of resulting in death, a requirement of the objective test for implied malice.

## B. Subjective Test

As noted earlier, implied malice for second degree murder contains not only an objective test but also a subjective test. The subjective test asks whether the defendant " ' "kn[ew] that his conduct endanger[ed] the life of another." ' " (*Knoller*, *supra*, 41 Cal.4th at p. 143.) According to the majority, a reasonable jury could infer this subjective knowledge from evidence presented in this case, namely, the circumstances on which the majority, in its discussion of the *objective* test for implied malice, relies in concluding that death was a natural consequence of defendant's single blow. (Maj. opn., *ante*, at p. 14.) As I have discussed, I do not agree with the majority that those circumstances made death a natural consequence of the blow. (See pt. II.A., *ante*.) Consequently, I do not agree with the majority's conclusion that those same circumstances establish defendant's *subjective* knowledge that his conduct endangered Kauanui's life.

The majority also relies on three additional circumstances in support of its conclusion that defendant knew that his single blow endangered Kauanui's life, thus satisfying the subjective test for implied malice. (Maj. opn., *ante*, at p. 14.) None, however, sheds any light on defendant's knowledge at the time of the blow. The majority points out that defendant had earlier urged his friend, House, to fight Kauanui. That fact, however, is irrelevant to whether defendant knew, when he later hit Kauanui, that his single blow endangered Kauanui's life. The other two circumstances cited by the majority pertain to defendant's not seeking medical help

4

for Kauanui immediately after the blow, and defendant's trivializing the incident the next day.  (*Ibid.*)  But defendant's behavior *after* the blow does not tend to establish his knowledge *at the time* of the blow that his act endangered Kauanui's life.

My conclusion that such knowledge was not shown is supported by the following two circumstances:  First, defendant, who is right-handed, hit Kauanui with his left fist, and therefore had less reason to suspect that the blow would endanger Kauanui's life.  Second, as the Court of Appeal noted, defendant's past conduct in four instances of hitting other people with unexpected blows "*without inflicting any life-threatening injury* tends to negate an inference of subjective knowledge" that his sudden, unexpected blow to Kauanui would endanger Kauanui's life.

For the reasons expressed above, I agree with the Court of Appeal that, because of insufficient evidence of implied malice, defendant's conviction of second degree murder cannot stand.

KENNARD, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Cravens

_____

**Unpublished Opinion** XXX NP opn. filed 8/18/10 – 4th Dist., Div. 1
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S186661
**Date Filed:** January 30, 2012

_____

**Court:** Superior
**County:** San Diego
**Judge:** John S. Einhorn

_____

**Counsel:**

Randall Bookout, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown. Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Lilia E. Garcia, Pamela Ratner-Sobeck and Jeffrey J. Koch, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Randall Bookout
Post Office Box 181050
Coronado, CA  92178
(619) 857-4432

Gary W. Schons
Assistant Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2213