Filed 3/17/21  P. v. Ortiz CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE, <br><br>   Plaintiff and Respondent, <br><br> v. <br><br> SERGIO ORTIZ, <br><br>   Defendant and Appellant. | 2d Crim. No. B300776 <br> (Super. Ct. No. <br> F000270432003) <br> (San Luis Obispo County) |

     Appellant Sergio Ortiz was convicted of second degree murder in 1998.  (Pen. Code, §§ 187, subd. (a), 189.)[1]  In 2019 he filed a petition to vacate his murder conviction and obtain resentencing pursuant to section 1170.95, which was added to the Penal Code by Senate Bill No. 1437 (S.B. 1437).  (Stats. 2018, ch.

---

    [1] All statutory references are to the Penal Code.

1015, § 4.)  The trial court denied the petition because he had failed to make a prima facie showing that he could not be convicted of murder under current law.  We affirm.

*Procedural Background*

In addition to being convicted of second degree murder, appellant was convicted of conspiracy to commit assault by means of force likely to produce great bodily injury.  (§§ 182, subd. (a)(1), 245, former subd. (a)(1), now subd. (a)(4).)  The jury found true an allegation that he had committed the murder for the benefit of a criminal street gang.  (§ 186.22, subd. (b)(1).)  He was sentenced to prison for 15 years to life.  In a 2001 nonpublished opinion, *People v. Garcia et al.* (July 23, 2001, B126854) [nonpub. opn.] (*Garcia 1*), we affirmed the judgment of conviction as to appellant and his codefendants: Oscar Garcia, David Rey, Gregory Vived, Jr., and Monte Weatherington.

Appellant was still incarcerated in 2019 when he filed his petition for relief pursuant to section 1170.95.  In support of the petition, appellant declared:  (1) he was convicted of second degree murder under the natural and probable consequences doctrine; (2) he could not currently be convicted of murder because of changes made by S.B. 1437; (3) he was not the actual killer; (4) he "did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of murder;" and (5) he "was not a major participant who acted with reckless indifference to human [life]."

The trial court considered the statement of facts in our 2001 opinion.  Based on those facts, it denied appellant's petition because he had failed to make a prima facie showing that under current law he could not "be convicted of second degree murder on an implied or express malice theory."

2

We affirm.  We conclude that appellant's showing did not rise to the statutorily required "prima facie" level because the statement of facts in our 2001 opinion establishes that under current law he could be convicted of second degree murder on a theory of implied malice.

*Facts*

The facts are taken from the statement of facts at pages 2-5 of our nonpublished *Garcia 1* opinion, which was attached as "Exhibit A" to appellant's section 1170.95 petition.

"Paso Robles 13 (Paso 13) is a criminal street gang.  [Raul] Mosqueda, whose moniker is 'dreamer,' was a past associate of Paso 13.  Mosqueda was friendly with the members of Nameless Crew Style (NCS), a rival gang that was engaged in 'warfare' with Paso 13. . . .  Paso 13 put out a 'green light' on Mosqueda, which meant that he was 'free game' to kill.  [David] Rey and [Oscar] Garcia were members of Paso 13, and [appellant] associated with the gang.  [¶] . . . Rey believed that Mosqueda had falsely accused him of vandalizing [appellant's] car.  Rey told [appellant] that Mosqueda had committed the vandalism.  Rey said he 'was going to take care' of 'dreamer.'

"[¶]

"[¶]

"During the evening of April 12, 1998, Reginald Calhoun went to the trailer park residence of [appellant] and [Monte] Weatherington.  [Appellant and other persons were present] there.  Mosqueda became the subject of conversation, and everyone was saying, 'Hey, we want to kick dreamer's ass.'

"Calhoun was paged by [Gregory] Vived[, Jr.].  Calhoun telephoned Vived, who said that Mosqueda was going to be at a party in Paso Robles. . . .

3

"Calhoun, [Manuel] Preciado, and [five other persons, including appellant,] drove to the Paso Robles party in three cars. Rey was the sole passenger in a car driven by Garcia. Rey was armed with a knife that he displayed to Garcia inside the car. Rey put the knife in his pocket. At the trailer park, Rey had not displayed the knife or mentioned that he possessed it.

"After parking their cars in Paso Robles, Calhoun, Preciado, and [the five other persons, including appellant,] walked to the apartment where the party was occurring. Weatherington knocked on the front door. A female opened the door, and Weatherington asked to speak to 'dreamer.' Mosqueda came to the door and said, 'What do you guys want?' Weatherington told him to come outside. Mosqueda said, 'We don't want no problems here.' Mosqueda closed the door, and another person locked it.

"[¶] Calhoun picked up a potted plant and threw it through a plate-glass window. Rey and Weatherington kicked the front door open. Calhoun, Preciado, and [five other persons, including appellant,] ran through the doorway into the apartment. They were saying, 'Get your beating like a man,' and 'You know what time it is. You know it's up.' Everyone inside 'just started scattering.' Mosqueda retreated into a bathroom and tried to close the door. Calhoun testified that he and Rey pulled Mosqueda out into the hallway, but other witnesses testified that Weatherington did the pulling. Calhoun and [five other persons, including appellant,] punched Mosqueda in the hallway. There was 'a big commotion of bodies' and people were screaming.

"[¶]

"Mosqueda fell to the floor and was lying on his side against a wall. Garcia said to Rey, 'You got a knife. You got a

4

knife. Stick him. Stick him.' Rey stabbed Mosqueda four times in the chest. Mosqueda crawled out of the hallway 'like a baby' on his hands and knees with blood on his face, chest, and stomach. Rey, Vived, Garcia, [appellant], and Calhoun were 'around him' and were punching and kicking him. People in the background were saying, 'Leave him alone. He's knocked out.['] Mosqueda fell to his side. Rey, Vived, Garcia, [appellant], and Calhoun continued to hit and kick him. Garcia said, 'Now what's up dreamer? . . . Now you ain't talking. You're not saying nothing now, are you?' Vived stopped 'swinging and kicking' and 'jumped up against the wall.' He said, 'Oh shit . . . What happened? What happened?' Vived appeared to be 'in shock.' Everybody except [appellant] ceased attacking Mosqueda. [Appellant] kicked him twice in the head. . . .

"Later that night, Preciado, appellant, and Weatherington met Garcia in a parking lot. Garcia told them that Rey had stabbed Mosqueda 'penitentiary style, real quick,' and that anyone who said 'anything to the cops' would 'get bumped off' in prison. Garcia said that Rey 'had got his stripes.' This meant that Rey had earned respect from other gang members and 'was up at the top with the big boys . . . .'

"When Garcia left, Preciado, appellant, and Weatherington went to a motel. According to Preciado, at the motel they discussed the stabbing, agreeing that Rey 'was wrong for doing it . . . without saying anything . . . .' But earlier in the evening [appellant] had declared, 'We got their guy. It's going to be a good night.'

"An expert on criminal street gangs testified that the killing of Mosqueda had benefited Paso 13 because it had 'slowed

5

down' the escalation in violence between Paso 13 and NCS and had 'put [Paso 13] back on top.'"

### *Cause of Death*

During oral argument on appellant's section 1170.95 petition, his counsel said that at trial Dr. Walker had testified "that the cause of death, period, was the four stab wounds . . . . Nothing, no actions by [appellant] whatsoever caused the death. In fact, all of their injuries [injuries inflicted upon Mosqueda by persons other than Rey] according to the doctor were non[-]life-threatening." The *Garcia 1* opinion states, "The [autopsy] pathologist testified that, although Mosqueda had sustained multiple contusions and abrasions that might have been caused by being hit or kicked, the blows did not cause internal or life-threatening injuries." (*Garcia 1*, *supra*, B126854, at p. 20.)

### *Codefendants' Section 1170.95 Petitions*

Codefendants Garcia, Vived, and Weatherington were also convicted of second degree murder. They filed petitions for relief under section 1170.95. In *People v. Garcia* (2020) 57 Cal.App.5th 100, review granted Feb. 10, 2021, S265692 (*Garcia 2*), we affirmed the trial court's order denying Garcia's petition for failure to make a prima facie showing. On the same date that the trial court denied appellant's petition, it ruled that Vived and Weatherington had made the requisite prima facie showing. It issued orders to show cause and set their matters for an evidentiary hearing. At the conclusion of the hearing, the trial court denied their petitions. Their appeals are pending. (*People v. Vived*, B303872; *People v. Weatherington*, B303125.)

### *S.B. 1437*

"Under the felony-murder rule as it existed prior to Senate Bill 1437, a defendant who intended to commit a specified felony

6

could be convicted of murder for a killing during the felony, or attempted felony, without further examination of his or her mental state.  [Citation.] . . . [¶]  Independent of the felony-murder rule, the natural and probable consequences doctrine rendered a defendant liable for murder if he or she aided and abetted the commission of a criminal act (a target offense), and a principal in the target offense committed murder (a nontarget offense) that, even if unintended, was a natural and probable consequence of the target offense.  [Citation.]" (*People v. Lamoureux* (2019) 42 Cal.App.5th 241, 247-248; see also *People v. Chiu* (2014) 59 Cal.4th 155, 158 ["'under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted"'"].)  "The natural and probable consequences doctrine . . . differs from the law of conspiracy, which holds a person liable for crimes that he or she agreed with one or more persons to commit and that a member of the conspiracy committed in furtherance of the agreement." (*People v. Gentile* (2020) 10 Cal.5th 830, 844 (*Gentile*).)

In S.B. 1437 the Legislature declared, "It is necessary to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) To achieve this goal, S.B. 1437 amended section 189, insofar as it pertains to the felony-murder rule, to add subdivision (e), which provides:  "A participant in the perpetration or attempted

7

perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: (1) The person was the actual killer.  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."  (Stats. 2018, ch. 1015, § 3.)

S.B. 1437 also amended section 188 to add subdivision (a)(3), which provides, "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime."  (Stats. 2018, ch. 1015, § 2.)  The Legislature declared, "A person's culpability for murder must be premised upon that person's own actions and subjective mens rea."  (*Id.*, § 1, subd. (g).)  "[T]he most natural reading of Senate Bill 1437's operative language is that it eliminates natural and probable consequences liability for first and second degree murder."  (*Gentile*, *supra*, 10 Cal.5th at p. 849.)

Section 1170.95, added by S.B. 1437, gives retroactive effect to the changes in sections 188 and 189.  It provides, "A person convicted of felony murder or murder under a natural and probable consequences theory may file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts when" certain conditions apply.  (§ 1170.95, subd. (a).) One of the conditions is that "[t]he petitioner could not be convicted of first or second degree murder because of changes to

8

Section 188 or 189 made [by S.B. 1437] effective January 1, 2019." (*Id.*, subd. (a)(3).) The petition must include a declaration by the petitioner showing that he is eligible for the relief afforded by section 1170.95. (*Id.*, subd. (b)(1)(A).)

"The court shall review the petition and determine if the petitioner has made a *prima facie showing* that the petitioner falls within the provisions of [section 1170.95]. . . . If the petitioner makes a *prima facie showing* that he or she is entitled to relief, the court shall issue an order to show cause." (§ 1170.95, subd. (c), italics added.) "Within 60 days after the order to show cause has issued, the court shall hold a hearing to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner . . . ." (*Id.*, subd. (d)(1).) "At the hearing . . . , the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. . . . The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (*Id.*, subd. (d)(3).)

### *The Trial Court Properly Considered the Statement of Facts in Garcia 1*

Appellant contends that, in ruling that he had not made a prima facie showing of entitlement to relief under section 1170.95, the trial court improperly relied on the statement of facts in *Garcia 1*. We reject the contention for the reasons explained in *Garcia 2*, *supra*, 57 Cal.App.5th at pp. 110-112.)

### *Jury Instructions*

The jury was instructed on four theories of second degree murder: (1) an intentional killing with malice aforethought but without deliberation and premeditation; (2) aiding and abetting

9

together with the natural and probable consequences doctrine; (3) liability for the act of a coconspirator in furtherance of the conspiracy; and (4) implied malice.

*Standard of Review*

We independently review the trial court's ruling that appellant failed to make a prima facie showing. (*Garcia 2*, *supra*, 57 Cal.App.5th at p.110.)

*Garcia 2 Holding: When Petitioner*

*Fails to Make a Prima Facie Showing*

In *Garcia 2* we held: "[W]here . . . the record of conviction contains substantial evidence based on which a reasonable trier of fact could find the petitioner guilty of murder beyond a reasonable doubt under current law despite the changes made by Senate Bill 1437, the petitioner has failed to carry his burden of making a prima facie showing that he could not presently be convicted of murder because of changes made by Senate Bill 1437. (§ 1170.95, subds. (a)(3), (c).) The petition must be denied even though the assertions in the petition, if true, would satisfy the statutory criteria for relief." (*Garcia 2*, *supra*, 57 Cal.App.5th at p.106.)[2]

---

[2] On February 10, 2021, the California Supreme Court granted review in *Garcia 2*, S265692. The court's notes state: "Further action in this matter is deferred pending consideration and disposition of related issues in *People v. Lewis*, S260598, and *People v. Duke*, S265309." In *Duke* the Supreme Court said, "The issue to be briefed and argued is limited to the following: Can the People meet their burden of establishing a petitioner's ineligibility for resentencing under Penal Code section 1170.95, subdivision (d)(3) by presenting substantial evidence of the petitioner's liability for murder under Penal Code sections 188 and 189 as amended by Senate Bill No. 1437 (Stats. 2018, ch.

10

In *People v. Duchine* (2021) 60 Cal.App.5th 798, the court rejected our holding in *Garcia*. *Duchine* held "that the prima facie showing the defendant must make is that he did not, in fact, act or harbor the mental state required, for a murder conviction under current law." (*Id*. at p. 815.) The court further held: "[A]bsent a record of conviction that conclusively establishes that the petitioner engaged in the requisite acts and had the requisite intent, the trial court should not question his evidence. . . . The record should be consulted at the prima facie stage only to determine 'readily ascertainable facts,' such as the crime of conviction and findings on enhancements." (*Ibid*.) If the Legislature had intended the prima facie showing requirement to be so construed, it could have easily modified the first sentence of section 1170.95, subdivision (c) to read as follows (italicized language added): *"Accepting the petitioner's averments as true unless the record of conviction conclusively proves them false,* the court shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section." The legislature omitted the italicized language, and we should not add it. "Courts may add language to a statute in extreme cases where they are convinced the Legislature inadvertently failed to utilize the words which would

---

1015), or must the People prove every element of liability for murder under the amended statutes beyond a reasonable doubt?" (*People v. Duke* (Jan. 13, 2021, No. S265309) ___Cal.5th___ [2021 Cal. LEXIS 242, at *1].) In *Lewis* the relevant issue under consideration is whether superior courts may "consider the record of conviction in determining whether a defendant has made a prima facie showing of eligibility for relief under Penal Code section 1170.95." (*People v. Lewis* (Mar. 18, 2020, S260598) __Cal.5th __ [2020 Cal. LEXIS 1946].)

11

give purpose to its pronouncements. [Citation.] In our view, this is not such a case." (*Schneider v. California Coastal Com.* (2006) 140 Cal.App.4th 1339, 1345.)

*No Prima Facie Showing that Appellant Could Not Be Convicted of Second Degree Murder on Implied Malice Theory*

"'Malice is implied when the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'" [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another . . . .'" (*People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*).) "Implied malice does not require an intent to kill." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) S.B. 1437 did not repeal the law imposing criminal liability for implied malice murder. (*Gentile*, *supra*, 10 Cal.5th at p. 850 ["notwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life"].)

Based on the facts set forth in *Garcia 1*, for the following six reasons appellant currently could be convicted of second degree murder on an implied malice theory:

(1) Appellant together with six other persons forcibly invaded a home with the express intent to "'kick dreamer's ass.'" (*Garcia 1*, *supra*, B126854, at p. 3.) "Calhoun testified . . . that, when seven persons 'invade a house' to 'kick somebody's ass,' the

12

victim could be hurt badly enough to sustain broken bones or die." (*Id*. at p. 19.)

(2) At the time of the home invasion, appellant specifically intended that he and his accomplices would assault Mosqueda by means of force likely to produce great bodily injury. The jury found appellant guilty of conspiracy to commit such an assault. (§§ 182, subd. (a)(1), 245, former subd. (a)(1), now subd. (a)(4).) "[T]he crime of conspiracy requires dual specific intents: a specific intent to agree to commit the target offense, and a specific intent to commit that offense." (*People v. Jurado* (2006) 38 Cal.4th 72, 123.)

(3) The assault was committed against a person who had been "green-lighted" by a criminal street gang, Paso 13. Two of the assailants – Rey and Garcia – were members of the gang. The "green light" "meant that [Mosqueda] was 'free game' to kill." (*Garcia 1*, *supra*, B126854, at p. 2; see *People v. Gomez* (2018) 6 Cal.5th 243, 263 [gang expert "explained that individuals can be placed 'on a green light list' and that 'gang members have a green light or the authorization to assault and murder whoever is on that list' "]; *People v. Parrish* (2007) 152 Cal.App.4th 263, 278 ["a gang member . . . may be made subject of a 'green light,' which . . . is authorization from authority figures in the gang to kill that person"].) The green light increased the risk that the assault would result in Mosqueda's death. It is reasonable to infer that appellant knew Mosqueda had been green-lighted by the gang and understood the significance of the green light. Appellant associated with Paso 13. The jury found true an allegation that he had committed the murder for the benefit of the gang. (§ 186.22, subd. (b)(1).)

(4) Appellant knew that the actual killer, gang-member Rey, bore a personal grudge against Mosqueda. "Rey believed that Mosqueda had falsely accused him of vandalizing [appellant's] car. Rey told [appellant] that Mosqueda had committed the vandalism. Rey said he 'was going to take care' of 'dreamer.'" (*Garcia 1*, *supra*, B126854, at p. 2.)

(5) Appellant and five other persons, including two gang members, viciously assaulted Mosqueda, who was on his own and unarmed. After Rey had mortally wounded Mosqueda, appellant and four other persons "continued to hit and kick" him while he was "on his hands and knees with blood on his face, chest, and stomach." (*Garcia 1*, *supra*, B126854, at p. 4.) After the other assailants had ceased their attack, appellant kicked Mosqueda twice in the head. In *Garcia 1* we noted, "Ortiz admitted kicking Mosqueda in the head while Mosqueda was lying on the floor." (*Id*., at p. 20.) Although the kicks were not a substantial factor in causing Mosqueda's death, it is common knowledge that kicks to the head can be dangerous to human life. (See *People v. Guillen* (2014) 227 Cal.App.4th 934, 990 ["stomping on someone who has been severely beaten and is defenseless demonstrates a conscious disregard of life"]; *Cravens*, *supra*, 53 Cal.4th at p. 511 ["the jury was entitled to infer defendant's subjective awareness that his conduct endangered [the victim's] life from the circumstances of the attack alone, the natural consequences of which were dangerous to human life"].)

(6) After the killing appellant declared, "'We got their guy. It's going to be a good night.'" (*Garcia 1*, *supra*, B126854, at p. 5.) By using the word "we," appellant took credit for Mosqueda's murder. He did not say, "Rey got their guy." Appellant's statement, "'It's going to be a good night,'" shows that he not only

14

approved of the murder, but also intended to celebrate it. (See *Cravens*, *supra*, 53 Cal.4th at p. 511 [that defendant "took no steps to ascertain [the victim's] condition or to secure emergency assistance" and instead "bragged about his own prowess, laughed and joked about [the victim's] condition . . . bolstered the finding of implied malice"].)

Considering all of the above circumstances, a reasonable trier of fact could find beyond a reasonable doubt that (1) appellant deliberately participated in the brutal gang beating of a defenseless victim knowing that the victim had been green-lighted by the gang, (2) the natural consequences of his conduct were dangerous to human life, and (3) appellant knew that his conduct endangered Mosqueda's life and acted with conscious disregard for life. "Given the great potential for escalating violence during gang confrontations, it is immaterial whether [appellant] specifically knew [Rey] had a [knife]." (*People v. Montes* (1999) 74 Cal.App.4th 1050, 1056.) The potential for escalating violence was especially great here because of the green light that Paso 13 had put out on Mosqueda, the violent nature of the home invasion, and the number of persons involved in the attack (seven against one).

Accordingly, appellant failed to carry his burden of making a prima facie showing that he "could not be convicted of first or second degree murder because of changes [made by S.B. 1437] to Section 188 or 189 . . . ." (§ 1170.95, subd. (a)(3).)

*Disposition*

The order denying appellant's petition for relief is affirmed.

15

NOT TO BE PUBLISHED.

YEGAN, J.

We concur:

GILBERT, P. J.

PERREN, J.

Jacquelyn H. Duffy, Judge

Superior Court County of San Luis Obispo

_____

Mark D. Lenenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

17