Filed 9/15/25  P. v. Sanchez CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B330862 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA059880) |
| v. | |
| DONALD GEORGE SANCHEZ, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jacqueline Lewis, Judge.  Affirmed.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Analee J. Brodie, Deputy Attorneys General, for Plaintiff and Respondent.

––––––––––––––––––––––

In 2004, a jury convicted Donald George Sanchez of second degree murder.  Sanchez now appeals from the trial court's order denying his petition for resentencing under Penal Code section 1172.6.[1]  After an evidentiary hearing, the trial court concluded the People proved beyond a reasonable doubt that Sanchez was guilty of second degree implied malice murder as a direct aider and abettor.  The court denied the petition for resentencing.  We affirm the trial court order.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

*Underlying crime*

On September 19, 2002, Daniel Zamorano went to Edwin Moreno's home.  Zamorano had fought with Moreno's younger brother earlier that day and wanted to fight Moreno.  The two men exchanged a few punches and Moreno kicked Zamorano once in the face.  Zamorano started to leave, but continued taunting Moreno.  Moreno followed him across the street and they hit each other a few more times.  Zamorano started to run away again when Sanchez, Robert Ramirez, Marco Salazar, and Eduardo Cabello approached.  Moreno went inside his house.

––––––––––––––––––––––

[1]     All further undesignated statutory references are to the Penal Code.  Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6 with no change in text. (Stats. 2022, ch. 58, § 10.)  We refer to the law formerly codified at section 1170.95 as section 1172.6 for the remainder of this opinion.

[2]     We take the facts from the evidence admitted at the section 1172.6 evidentiary hearing, including the original trial transcripts.

Ramirez, Sanchez, Salazar, and Cabello attacked Zamorano. Ramirez was armed with a folding knife. Edward Sanchez, who lived nearby, came out of his house and yelled, " 'That's enough' " at the group. Sanchez, Salazar, and Cabello stopped attacking Zamorano and ran to an alley behind Ramirez's house. Ramirez remained behind and arrived in the alley after the others.

Zamorano was bleeding badly from wounds on his chest and neck. Edward Sanchez remained with him until the paramedics arrived. Zamorano died of multiple stab wounds.

### Testimony about Sanchez and his involvement

A gang expert testified that Sanchez and Ramirez were members of the Azusa 13 gang, the predominant gang in the city of Azusa. The expert believed Salazar was also an active member of Azusa 13.

Moreno testified that he was returning to his house as Sanchez and the others were trying to get to Zamorano. Moreno heard Sanchez say " 'Come over here, homes,' " and " 'Get the filero,' " meaning knife. Moreno did not hear any of the other men say anything. Immediately after Sanchez said " 'Come over here, homes,' " Moreno saw one of the four men grab Zamorano by the shirt and then saw Zamorano on the ground.

Carlos Sardinas was a friend of Moreno's and was at Moreno's house on the day Zamorano was killed. He saw Moreno and Zamorano fighting and then saw three or four individuals chasing Zamorano. Sardinas identified Sanchez, Ramirez, and Salazar as part of the group that chased Zamorano.

Cabello testified that Sanchez punched and kicked Zamorano.

***Trial and postconviction proceedings***

In 2004, the People charged Sanchez, Ramirez, and Salazar with the murder of Zamorano (§ 187).  The People alleged that the murder was committed for the benefit of, in association with, or at the direction of a criminal street gang (§ 186.22, subd. (b)(1)(A)), and that Ramirez personally used a deadly weapon (§ 12022, subd. (b)(1)).

In October 2004, a jury convicted Sanchez of second degree murder committed for the benefit of a criminal street gang.  In November 2004, the trial court sentenced Sanchez to a term of 15 years to life with a 10-year gang enhancement.  In December 2004, the trial court struck the gang enhancement and sentenced Sanchez to 15 years to life.

In 2006, a panel of this Division affirmed Sanchez's conviction on direct appeal.

***Petition for resentencing***

In January 2019, Sanchez filed a petition for resentencing under section 1172.6.  The trial court denied the petition on the ground that Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437) was unconstitutional.  In March 2020, a panel of this Division reversed the trial court's order and concluded that Sanchez was entitled to have his petition considered on the merits.

In January 2022, the parties stipulated that a prima facie case for relief had been established and the trial court issued an order to show cause.

In May 2023, the trial court held an evidentiary hearing.  Prior to the hearing, the court had reviewed the abstract of judgment, charging document, trial transcripts, jury instructions,

4

verdict forms, and Court of Appeal opinion. The court admitted those items into evidence.

Sanchez testified at the evidentiary hearing. According to Sanchez, prior to the crime, he had been drinking and smoking marijuana with Ramirez, Salazar, and Cabello at Ramirez's house. He and the others went on a walk and saw an altercation taking place involving Moreno. Moreno's brothers and their friends were present. Sanchez, Salazar, and Cabello also went to the defense of Moreno. There was "a good crowd" of people present. Sanchez tried to hit Zamorano but could not because there were "too many people on him already." Moreno and his brothers and friends ran back to Moreno's house. Edward Sanchez then came out with a stick in his hands, saying, " 'Leave him alone. That's enough.' " Sanchez took off running, but Ramirez remained behind and caught up a few minutes later. Sanchez testified that he said nothing to the people around him and was just trying to keep up with the others running away because he was the most heavyset of the group. He denied saying or hearing anyone say "dame el filero" (give me the knife). He also denied knowing that Ramirez had a knife.

Sanchez testified that he participated in jumping Zamorano because, as he explained it: "I was into the gangs, and I wanted to be cool, and I followed suit. You know, they started jumping him, so I just did what I did many times I did before. I fought in many fights. I jumped people before. I just did what I knew." He did not try to help Zamorano or try to stop others from beating him. He explained: "I wasn't trying to help the guy. You know, I was there to jump the guy, not there to help him. [¶] . . . [¶] I never stopped anybody. [¶] . . . [¶] I wanted to jump him."

In May 2023, the trial court denied the petition for resentencing. In its memorandum of decision, the trial court found that Sanchez aided and abetted the stabbing of Zamorano by grabbing Zamorano by the shirt, saying " 'Come over here, homes,' " and later saying " 'Get the filero' " while he and the others were beating Zamorano up. That Sanchez never attempted to stop the attack and fled the scene after the stabbing provided further evidence that he had aided and abetted the murder of Zamorano. The trial court further found that the People proved beyond a reasonable doubt that Sanchez had acted with implied malice, as he was "aware that his cohorts were willing and able to commit acts of violence against rival gang members"; he accompanied fellow gang members to attack Zamorano; he called out to Zamorano and grabbed his shirt, physically attacking Zamorano; he called for a knife, which he knew Ramirez had in his possession; and he admitted he was there to jump Zamorano.

Sanchez timely appealed.

## DISCUSSION

### I. Senate Bill No. 1437 and Section 1172.6

Senate Bill No. 1437 significantly narrowed accomplice liability for murder by eliminating the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder and by limiting the scope of the felony murder rule. (*People v. Strong* (2022) 13 Cal.5th 698, 707–708; *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*); *People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*), superseded by statute on other grounds by Sen. Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill No. 775); Stats. 2021, ch. 551.)

6

The bill amended section 188 by adding the requirement that, except as stated in section 189, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime."  (§ 188, subd. (a)(3).)  It amended the felony-murder rule by adding section 189, subdivision (e), which provides that a participant in the perpetration of certain enumerated felonies in which a death occurs is liable for felony murder only if the person (1) was the actual killer, (2) was not the actual killer but, with the intent to kill, " 'aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree,' " or (3) the person was a " 'major participant in the underlying felony and acted with reckless indifference to human life,' " as described in section 190.2, subdivision (d).  (*Gentile, supra*, 10 Cal.5th at p. 842; § 189, subd. (e).)

"[A] principal in a murder, including an aider or abettor, may still be criminally liable if that individual personally possesses malice aforethought, whether express or implied." (*People v. Harris* (2024) 105 Cal.App.5th 623, 631; *People v. Silva* (2023) 87 Cal.App.5th 632, 639–640; *People v. Offley* (2020) 48 Cal.App.5th 588, 595–596 [Sen. Bill No. 1437 did not "alter the law regarding the criminal liability of direct aiders and abettors of murder because such persons necessarily 'know and share the murderous intent of the actual perpetrator' "].)

Section 1172.6 sets forth a procedure that allows a person convicted of a qualifying offense under the former law to petition for resentencing if the person could no longer be convicted of the offense under amended sections 188 or 189.  (*Lewis, supra*, 11 Cal.5th at p. 959; *Gentile, supra*, 10 Cal.5th at p. 847; see also

7

Sen. Bill No. 775, § 2 [further amending statutory procedures in § 1172.6].) If the court determines the petitioner has made a prima facie case for relief, the court must issue an order to show cause. (§ 1172.6, subd. (c).)

Within 60 days, " 'the court must hold an evidentiary hearing at which the prosecution bears the burden of proving, "beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder" under state law as amended by Senate Bill No. 1437 . . . .' " (*People v. Njoku* (2023) 95 Cal.App.5th 27, 41; § 1172.6, subd. (d)(1), (3).)

At the evidentiary hearing, the trial court determines whether "the petitioner committed [the underlying crime] under a still-valid theory . . . ." (*People v. Clements* (2022) 75 Cal.App.5th 276, 294 (*Clements*).) The trial court serves as "a fact finder tasked with holding the People to the beyond a reasonable doubt standard . . . ." (*Id*. at pp. 294–295.) It " 'must impartially compare and consider all the evidence that was received throughout the entire trial' and determine whether that 'proof . . . leaves you with an abiding conviction that the charge is true.' [Citations.]" (*Id*. at p. 295.) Under section 1172.6, subdivision (d)(3), "[a] finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3); *Clements*, at pp. 294–297.)

## II. Standard of Review

We review the trial court's findings after an evidentiary hearing under section 1172.6, subdivision (d)(3), for substantial evidence. (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022 (*Owens*).) "Under this familiar standard, ' "we review the entire record in the light most favorable to the judgment to determine

8

whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citation.]" (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951; *Clements*, *supra*, 75 Cal.App.5th at p. 298.) We do not resolve credibility issues or evidentiary conflicts. (*Owens*, at p. 1022.) " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) Before we may set aside a trial court's order, it must be clear that " ' "upon no hypothesis whatever is there sufficient substantial evidence to support [it]." ' [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

III.  **Substantial Evidence Supports the Trial Court's Finding that Sanchez was Guilty of Implied Malice Second Degree Murder as an Aider and Abettor**

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. (§ 188, subd. (a).) "It is express when there is a manifest intent to kill (§ 188, subd. (a)(1)); it is implied if someone kills with 'no considerable provocation . . . or when the circumstances attending the killing show an abandoned and malignant heart' (§ 188, subd. (a)(2))." (*Gentile*, *supra*, 10 Cal.5th at p. 844.) "The primary difference between express malice and implied malice is that the former requires an intent to kill but the latter does not." (*People v. Soto* (2018) 4 Cal.5th 968, 976.)

Implied malice murder instead requires that the killing be proximately caused by an act, " ' " 'the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of

9

another and who acts with conscious disregard for life.' " ' [Citation.]" (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).) Proximate causation requires the act to have been a substantial factor contributing to the death.  (*Ibid*.)

The guilt of an aider and abettor to a crime, including murder, is "based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)  "A person aids and abets the commission of a crime when [the person], (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.)

Accordingly, for aiding and abetting liability on a theory of implied malice murder to be imposed, a direct aider and abettor must, by words or conduct, aid the perpetrator's commission of a life-endangering act with the "knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life," and the aider and abettor must act "in conscious disregard for human life."  (*People v. Powell* (2021) 63 Cal.App.5th 689, 713, italics omitted, cited with approval by *Reyes*, *supra*, 14 Cal.5th at p. 991 [implied malice murder requires proof of aider and abettor's "knowledge and intent with regard to the *direct perpetrator's* life endangering act"].)  In other words, under current law, "a direct aider and abettor of the killing who knew that his (or her) conduct endangered the life of another and acted with conscious disregard for life, may be guilty

10

of second degree murder." (*People v. Langi* (2022) 73 Cal.App.5th 972, 979.)

Viewing the evidence here in the light most favorable to the trial court's order, the record contains substantial evidence that Sanchez aided and abetted the murder of Zamorano with implied malice. The trial evidence and Sanchez's testimony at the evidentiary hearing establish that Sanchez participated in the group attack on Zamorano. Trial testimony further establishes that Sanchez knew Ramirez was armed with a knife and encouraged him to use the weapon. Cabello testified that he observed Ramirez playing with a folding knife when he, Ramirez, Sanchez, and Salazar were hanging out prior to the attack, and Moreno testified that Sanchez said " 'Get the filero' " as the four men approached Zamorano. Sanchez claims on appeal that he could have called for the knife "merely [to] intimidate the victim." However, the trial court could reasonably infer that there was no need to use a weapon to intimidate an outnumbered and apparently unarmed opponent, and that Sanchez called for the knife with the intent that Ramirez use it to stab Zamorano. The evidence is sufficient to support the conclusion that Sanchez knew that his conduct endangered Zamorano's life and that Sanchez acted with conscious disregard for life.

Other factors, such as the "victim's vulnerability, the number of assailants, the ferocity and duration of the attack, and the unusualness or unexpectedness of the victim's death," support the malice finding. (*People v. Superior Court* (*Valenzuela*) (2021) 73 Cal.App.5th 485, 502.) Zamorano was vulnerable in that he was alone, Moreno had already punched and kicked him, and four men attacked him. One man was armed with a knife. And based on the medical examiner's

11

testimony, the attack was ferocious because Zamorano died as the result of multiple stab wounds and suffered blunt force injuries.

The evidence also establishes that no one, including Sanchez, tried to help Zamorano, but instead they all fled from the crime scene. Failing to assist a wounded victim manifests "a callous indifference to human life." (*People v. Palomar* (2020) 44 Cal.App.5th 969, 978; see also *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 599 ["It is well settled that the presence at the scene of the crime and failure to prevent it, companionship and conduct before and after the offense, including flight, are relevant to determining whether a defendant aided and abetted in the commission of the crime."].)

On appeal, Sanchez observes that a defendant's act of traveling with an armed fellow gang member into rival gang territory does not satisfy the proximate causation requirement of implied malice murder, citing *Reyes*, *supra*, 14 Cal.5th 981. In *Reyes*, the Supreme Court explained such an act merely created a dangerous situation in which death was possible, depending on how circumstances unfolded, and standing alone did not satisfy the proximate causation requirement of implied malice murder. (*Id*. at pp. 988–989.) There was no evidence that Reyes's "acts precipitated or provoked the shooting." (*Id*. at p. 989.) While Reyes's act of traveling with fellow gang members into rival territory could result in a gang confrontation during which it was possible someone could get hurt or killed, the act did not by itself "give rise to a high degree of probability" death would result. (*Ibid*.) And if the act of shooting was the dangerous act, there had to be evidence Reyes knew the shooter intended to shoot, intended to aid him in shooting, knew shooting was dangerous to

life, and acted in conscious disregard for life.  (*Id*. at pp. 991–992.)

Here, Sanchez was not merely with fellow gang members when someone else attacked and stabbed Zamorano.  Sanchez called Zamorano over, personally kicked and punched him, and encouraged Ramirez to use the knife.  Stabbing someone is a life endangering act, as is the act of participating in a group beating of one person.  (*People v. Schell* (2022) 84 Cal.App.5th 437, 443 [evidence sufficient to support implied malice where defendant knew he was aiding violent group attack on victim and knew bat and shovel were being used against victim]; *People v. Cravens* (2012) 53 Cal.4th 500, 510–511 [violent force of defendant's punch to victim's head was predictably dangerous to human life].)

Sanchez contends that substantial evidence fails to support the trial court's ruling because the ruling was based on "a cluster of facts," including that Sanchez was the person to grab Zamorano's shirt to prevent him from fleeing.  Sanchez claims there was no evidence to support this specific finding.  Moreno testified that one of the men grabbed Zamorano by the shirt immediately after Sanchez said " 'Come over here, homes.' "  Even if Sanchez did not personally grab Zamorano, Sanchez's statement establishes that he wanted Zamorano to stop so the group could attack him.  Moreover, and contrary to Sanchez's claim, the evidence does not support that the stabbing was "separate from the group assault."  Moreno's testimony indicates that Sanchez called for the knife while the group was pursuing Zamorano and that Sanchez intended for Ramirez to use it during their attack.

In sum, Sanchez's argument that the evidence was insufficient to show he aided and abetted an implied malice

murder amounts to little more than an improper request that we reevaluate the evidence, something the substantial evidence standard of review forbids.  (*Owens*, *supra*, 78 Cal.App.5th at p. 1022.)

## DISPOSITION

The order denying Donald George Sanchez's Penal Code section 1172.6 petition is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EDMON, P. J.

EGERTON, J.

14