Filed 9/25/25  P. v. Cravens CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SETH CRAVENS,<br><br>    Defendant and Appellant. | D083539<br><br><br>(Super. Ct. No. SCD206917) |


APPEAL from an order of the Superior Court of San Diego County, David M. Gill, Judge.  (Retired Judge of the San Diego Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Alex Kreit, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley, Warren J. Williams and Evan Stele, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Seth Cravens appeals from the denial of his petition for resentencing pursuant to Penal Code[1] section 1172.6. After conducting an evidentiary hearing, the trial court denied the petition. Cravens claims (1) the court failed to make an independent finding beyond a reasonable doubt that he was guilty of implied malice murder, and (2) the evidence of implied malice was insubstantial. He asks us to reverse the court's order denying his petition. Finding no error, we affirm.

PROCEDURAL AND FACTUAL BACKGROUND

In May 2007, the San Diego County District Attorney charged Cravens with the murder (§ 187) of Emery Kauanui and several other crimes not relevant here. Kauanui died after Cravens punched him so hard he fell and cracked his head on a concrete road. Kauanui was the fifth person Cravens had punched in the face without warning over the course of the preceding two years. The case was tried to a jury in October 2008.

---

[1] Undesignated statutory references are to the Penal Code.

I.

*Evidence Adduced at Trial*[2]

Because the issues in the underlying petition for resentencing involve Cravens' murder conviction only, we limit our factual recitation to circumstances relevant to that crime.

A.    *Prior Similar Offenses*

"In October 2005, [Cravens] and one or two other people approached Eric Pardee outside a party. They were on the curb; Pardee was at street level. Pardee did not remember any arguing or even talking before [Cravens] jumped off the curb and delivered a sucker punch that knocked Pardee, who was six feet tall and weighed 155 pounds, unconscious and broke his cheekbone in multiple places.

"At another party on December 31, 2005, [Cravens] bumped into Ryan Granger and spilled a drink on Granger. When Granger asked, 'Dude, what's up?,' [Cravens] threatened to instigate a fight and demanded *Granger* apologize. Granger tried to ignore [Cravens] and turned his face away, but [Cravens] sucker punched him from the side and knocked him down. Matthew Yanke then told Granger, who was five feet 10 inches tall and weighed around 170 pounds, 'You better get the hell out of here.'

---

[2]    Our summary of the trial record is quoted directly from *People v. Cravens* (2012) 53 Cal.4th 500 (*Cravens*). *Cravens* is a prior decision by the California Supreme Court in the instant case. We quote from our high court's factual summary not only for convenience, but also because Cravens specifically addresses the Court's factual findings and conclusions as part of his insubstantial evidence argument. In compliance with section 1172.6, subdivision (d)(3), we have conducted an independent review of the relevant portions of the record, and we do not rely on the Court's prior appellate opinion for the factual findings necessary to resolve the issues presented here.

"In August 2006, Shannon O'Neill sought to stop a fistfight between [Cravens] and her boyfriend, Christopher Jarrett, at Windansea Beach. [Cravens] hit her in the face with a closed fist and knocked her into the sand.

"And on May 8, 2007, about two weeks before the murder, [Cravens] sucker punched Michael Johnson, without any warning whatsoever, outside The Shack Bar and Grill. Christopher Horning, Johnson's coworker, testified that [Cravens] stepped right up to Johnson and knocked him right in the face with 'as much force as you can possibly give a person.' Horning wanted to stop the violence, but one of [Cravens'] companions said, '[Y]ou don't want to get hurt. Stay out of it.' Johnson stood there in a daze and said nothing. [Cravens] taunted the disoriented Johnson and then punched him again, '[j]ust full out hit him as hard as you can.' Johnson fell to the ground. His nose was broken at an angle." (*Cravens*, *supra*, 53 Cal.4th at p. 510.)

B.   *Kauanui Offense*

Cravens, "then 21 years old, and the decedent, . . . Kauanui, 24, were . . . at the La Jolla Brew House on the night of May 23, 2007.  Kauanui, a professional surfer, was sitting at the bar and drinking with some friends while he waited for his girlfriend, Jennifer Grosso, to arrive.  Grosso left work late and got to the bar between 11:00 and 11:30 p.m. to find her boyfriend in a '[v]ery cheerful' mood.  About half an hour later, [Cravens] arrived with his friends, all former football teammates from La Jolla High School: Eric House, Matthew Yanke, Orlando Osuna, and Henri 'Hank' Hendricks.  Grosso went up to say 'hi' to [Cravens] and gave him a big hug.  [Cravens] and his friends approached the bar where Kauanui was seated and became 'like . . . a big group' where people were standing close to each other, 'kind of elbow to elbow.'

"Sometime later, Kauanui and Grosso started dancing next to the tables.  Kauanui had a full drink in his hand.  A little bit of it spilled accidentally on Eric House, who was close by.  House complained, 'You better watch out, you know.  I can knock you out with one punch.'  Kauanui replied, '[W]hat?  Like, what did you say?'  [Cravens] stepped in and said, 'Yeah.  You know [House] could beat your ass.  Like don't say anything.'  The mood became more aggressive, less joking, but Kauanui kept asking, '[D]o you guys have like a problem?'  In an effort to defuse the worsening situation, the bar manager, Ron Troyano, intervened and eventually suggested that Kauanui leave.  Troyano explained that Kauanui was not being kicked out but that it was easier to remove Kauanui than to evict [Cravens], who was there with many friends.  When Kauanui, who appeared calm, expressed a fear of being 'jumped' outside, Troyano said he would escort Kauanui to his car.  [Cravens] attempted to follow them as they left the bar, but Troyano told him twice to

5

stop and wait.  While Troyano was still at the vehicle, Grosso (who had been settling the tab) came out and said she would drive Kauanui home.  Grosso had consumed less than one drink; Kauanui had consumed three or four. [Cravens], House, Yanke, Osuna, and Hendricks eventually came outside to continue the argument, but Grosso and Kauanui drove off in Kauanui's car.

"Kauanui was on the phone as Grosso pulled up to Kauanui's house a couple minutes later.  She heard him say, 'If you want to fight me one on one, I'll fight you.'  She yelled at him to get off the phone.  He did so, and they went inside together.  She scolded him for acting in an immature manner. He apologized, admitted the situation was 'dumb,' and 'completely went back into a just really calm behavior.'  Satisfied that he was contrite, Grosso felt able to walk back towards the bar to retrieve her own car, which was parked illegally in a nearby lot.  He made her promise to come back and said he needed her.

"Grosso started out by walking but then realized the risk in being out alone at that time of night and jogged the rest of the way.  Unable to shake a bad feeling about what might happen, she picked up the pace and, as she was running down the alley near the bar, heard [Cravens] say, 'Let's go fuck him up. . . . [D]on't call him.  Don't call him.  I know where he lives.  Let's go fuck him up.'  She screamed out [Cravens'] name, but he and his friends sped past in a black Ford Explorer, ignoring her.  She immediately tried to call Kauanui, but he did not answer.  She ducked her head into the Brew House to tell her friends that Kauanui was going to get jumped.  Then she ran to her car and raced back to the house.  She figured she was one to two minutes behind [Cravens] and his friends.  Meanwhile, inside the Ford Explorer, [Cravens] was egging on and encouraging House to fight Kauanui.  The fight began promptly after [Cravens] and the others exited the Explorer.

6

"There was conflicting testimony as to whether the fight was truly a one-on-one battle between Kauanui and House or whether Kauanui was instead the victim of a group beating.

"Neighbor Erica Wortham was awakened by loud voices out in the street. She saw four people approaching Kauanui with the apparent intention of fighting. As she left her balcony to call 911, she heard 'a lot of blows, a lot of hitting. Like a maul. . . . [L]ike several people on top of each other hitting. . . . [R]eally awful. Like a soundtrack out of a movie.' The 911 call awakened her husband, Philip Baltazar, who saw what looked like a rugby scrum: 'What I saw were four guys on top of one guy, and four guys were either kicking or punching or elbowing or kneeing. And as I said, you know, it was moving. . . . [I]t was like a scrum line. And they were just whaling—four guys were just whaling, you know, on someone who turned out to be [Kauanui].'

"Dylan Eckardt, who was friends with Kauanui and was driving towards Kauanui's house after receiving a frantic phone call from his friend that there was going to be a fight, saw a few men circled around Kauanui, kicking or hitting him while he was on the ground. Eckardt's girlfriend, Karen Loftus, saw four or five people punching or kicking Kauanui while he was on the ground.

"On the other hand, [Cravens'] friends and former teammates Matthew Yanke and Hank Hendricks claimed that the fight was between House and Kauanui alone. Yanke testified that Kauanui came out swinging, but that House ducked, tackled Kauanui around his legs, and brought him down to the ground. Hendricks confirmed that House tackled Kauanui and brought him to the ground. Yanke described a wrestling match, in which House and

7

Kauanui took turns being on top.  Hendricks said that House initially had the upper hand but that Kauanui later had the advantage.

"In any case, House had the advantage when Grosso drove up.  House was straddling Kauanui and punching him with both fists.  Kauanui had one arm wrapped around House's shoulder, as though attempting a headlock, but it was not working.  Grosso honked her horn to wake up the neighbors, but the beating continued.  Kauanui was not yelling, he was not throwing any punches, and '[t]here was no strength being exerted from his body.'  Grosso ran up and kicked House in an effort to break up the fight, but House did not react to her other than to tell his friends to 'get her the fuck off of me.'  Hendricks pulled Grosso away, but she continued to scream out their names and vow that they would go to jail.  When this still failed to stop the fight, she started to kick at the headlights and pound on the body of the Ford Explorer.  The group then started talking amongst themselves, calling her 'crazy' and suggesting it was time to leave.

"Meanwhile, Kauanui had managed to get loose, but he was unsteady and could not walk straight.  Loftus was surprised he was able to get up at all.  Kauanui asked [Cravens], 'How the fuck are you going to jump me at my house?' and raised his palms upward, as though as 'what happened?'  He was not behaving in an aggressive manner.  But [Cravens] nonetheless 'came flying out' and "coldcocked' Kauanui.  At the time of the blow, [Cravens] was on the curb and Kauanui was at street level.  Grosso, Eckardt, and Hendricks opined that Kauanui was unconscious from the blow before he hit the ground.  The punch was described by witnesses as 'extremely hard' and 'one of the hardest punches I've ever seen thrown.'  Eckardt added that '[i]t was a knockout. . . .  [A]ll you heard was like boom, like, from his head hitting the concrete.  Nothing else hit first.  It was like a side punch [Kauanui] didn't

8

see.'  Even the neighbors could hear the sound of his skull hitting the ground.  A pool of blood started to stream from the back of Kauanui's head.  Grosso thought 'he was dead right then and there.'  Hendricks checked Kauanui's pulse to determine whether he was still alive.

"When Grosso asked [Cravens] why he did this, [Cravens] had no reaction.  Instead he said to his friends, 'Come on.  Let's go.'  Yanke drove [Cravens] away in the Ford Explorer.  Grosso testified that the Explorer drove away quickly.  Hendricks and Osuna left on foot.  House refused to leave; he was on all fours on the ground looking for his tooth.  (At the time police took him into custody, House had suffered a laceration above his right eye and a missing tooth, as well as abrasions to his knees and swollen knuckles.)  An ambulance took Kauanui to the hospital.  Kauanui had a blood-alcohol level of 0.17 percent when he was admitted, and his blood contained traces of marijuana.

"At the hospital, doctors performed a craniotomy (an operation to open the skull) and a craniectomy (removal of part of the skull to release pressure).  However, the pressure on Kauanui's brain remained high, despite maximal therapy, surgeries, and medications.  The brain injury continued to worsen, and Kauanui was pronounced brain dead on May 28, 2007.

"Christina Stanley, the forensic pathologist who performed the autopsy, described a skull fracture that radiated down into the base of the skull, spanned 15 centimeters across multiple bones, and ended up quite far forward on Kauanui's head, just behind the eye sockets.  The entire left side of his brain was swollen and had shifted over prior to surgery, cutting off one of the blood vessels supplying the right half of the brain.  According to her testimony, the more swelling there is, the less blood flow there is, which leads to more swelling—and, over a period of days, to brain death.  Kauanui's

9

injuries were consistent with being punched by someone coming off a greater height and propelling him onto a concrete surface. In Stanley's experience, the severe injuries Kauanui suffered—a fracture through the bony structures containing the ear canal, which are one of the thickest areas of the skull—can be seen in victims of motor vehicle crashes or in those struck in the head with a hammer, baseball bat, or tire iron. Kauanui's other injuries (abrasions and bruises on his arms, knees, shoulder and back) were not life threatening and were consistent with an assault. The cause of death was blunt-force head injuries.

"Yanke, testifying for the defense, claimed that Kauanui 'uppercut' House several times while House was repeatedly saying 'I'm done.' On the other hand, Hendricks, another defense witness, recalled that House said, 'You got me. You got me. It's over. It's over,' while he and Kauanui were holding each other like boxers in the 15th round. According to Yanke, [Cravens] had to push Kauanui away and said, 'Get off him. He's done. He's done. Get off him.' Both Yanke and Hendricks claimed that after Kauanui stood up, he charged towards [Cravens] and started speaking in an aggressive manner. Yanke recalled that [Cravens], who is right[-]handed, punched Kauanui with his left hand, and said that [Cravens] looked very shocked and worried after Kauanui fell. However, once they got to Yanke's house, [Cravens] bragged about knocking out Kauanui with his left hand. A few hours later, after Nur Kitmitto called [Cravens] to describe Kauanui's condition ('he didn't look good') and to warn him that the police were there and 'it's a big deal,' [Cravens] insisted he 'was willing to go back at [Kauanui] again.' The next morning, when Kristen Link called to ask whether [Cravens] had been in a fight with Kauanui, [Cravens] bragged, 'I would hardly call it a fight. I punched him out.' During a telephone conversation

10

that same morning between Hendricks and Nicole Sparks about the fight, [Cravens] laughed and said, 'We put him to sleep.'

"Yanke claimed he and [Cravens] drove away slowly after Kauanui fell, but he admitted crashing the Explorer into a retaining wall on the drive home.

"Hendricks admitted that [Cravens] was bigger, taller, and weighed quite a bit more than Kauanui. At the time of the murder, Kauanui was five feet 10 inches tall and weighed 181 pounds. [Cravens] stood six feet and weighed 240 pounds. The top of [Cravens'] left hand appeared swollen at the time of his arrest." (*Cravens*, *supra¸* 53 Cal.4th at pp. 502–506.)

II.

*Jury Verdict, Appeal, Petition for Review*

In November 2008, the jury convicted Cravens of implied malice murder in the second degree. He was sentenced to a total term of 20 years to life, including a term of 15 years to life on the murder conviction.

Cravens appealed. Among other issues, he argued there was insufficient evidence of implied malice to support the second degree murder conviction. In August 2010, another panel of this court agreed and directed the trial court to reduce the second degree murder conviction to voluntary manslaughter. The court reasoned that a person acts with implied malice, when the person "acts with conscious disregard for human life . . . [and] knows the act he or she is about to commit endangers the life of another but does not care. Implied malice requires both a high probability that defendant's act will result in death and such conscious disregard for human life. [Citation.] A single fist blow to the head does not involve a high probability of death simply because it occurs on pavement, and awareness that the recipient of . . . such a blow might fall and hit his or her head on the

11

pavement is merely awareness of a risk of serious bodily injury, not conscious disregard for life. . . . [A]wareness of a risk of causing serious bodily injury is insufficient for a finding of implied malice." (*People* v. *Cravens* (Aug. 18, 2010, D054613) [nonpub. opn.].)

The California Supreme Court granted review. In January 2012, the Court reversed, holding the evidence was sufficient to satisfy both the physical and mental components of implied malice. (*Cravens*, *supra*, 53 Cal.4th at pp. 510–512.) Justice Liu wrote a separate concurring opinion. (See *id*. at pp. 512–514 (conc. opn. of Liu, J.).) Justice Kennard dissented. (See *id*. at pp. 514–518 (dis. opn. of Kennard, J.).)

The majority reasoned as follows:

"[W]e must determine whether there is sufficient evidence to satisfy both the physical and the mental components of implied malice, the physical component being ' "the performance of 'an act, the natural consequences of which are dangerous to life,' " ' and the mental component being ' "the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.' " ' [Citation.] We conclude that both components are satisfied here.

"This state has long recognized 'that an assault with the fist . . . may be made in such a manner and under such circumstances as to make the killing murder.' [Citation.] However, 'if the blows causing death are inflicted with the fist, and there are no aggravating circumstances, the law will not raise the implication of malice aforethought, which must exist to make the crime murder.' [Citation.] Based on our review of the record, we find sufficient evidence that the manner of the assault and the circumstances under which it was made rendered the natural consequences of defendant's conduct dangerous to life.

12

"First, the record shows that [Cravens] targeted a smaller and shorter victim who was intoxicated, exhausted, and vulnerable. [Cravens] points out that Kauanui was a healthy young male and a professional athlete, but a reasonable jury could conclude that those attributes were of little assistance to him at the time of the murder. Kauanui's blood-alcohol level was 0.17 percent. Moreover, Kauanui was visibly worn out from the prior altercation, regardless of whether he had been repeatedly punched and kicked by Eric House alone or by House along with several of House's friends. There was testimony that just before [Cravens] attacked him, Kauanui was unsteady and unable to walk straight. Before Kauanui managed to stand up, Jennifer Grosso observed that '[t]here was no strength being exerted' from her boyfriend's body, and Karen Loftus was surprised he was even able to get up. Although unmentioned in the Court of Appeal's analysis of the sufficiency of the evidence supporting the judgment, those were the relevant facts available to the jury—not Kauanui's general physical condition when rested and sober—at the time [Cravens] swung hard against a fatigued and intoxicated victim who was two inches shorter and 60 pounds lighter. [Citation.]

"And it was a very hard punch. Witnesses described it as 'extremely hard' and 'one of the hardest punches I've ever seen thrown.' The punch was hard enough to knock Kauanui unconscious, despite his youth and fitness, even before he hit the ground. The absence of facial markings from the blow itself did not preclude the jury from considering the other evidence concerning the severity of the blow. Indeed, [Cravens'] punch was hard enough to force Kauanui's head to hit the pavement with an audible cracking sound that even the neighbors could hear, and caused skull fractures the forensic pathologist likened to the force experienced in a motor vehicle crash or from being struck in the head with a hammer, baseball bat, or tire iron.

13

Under these circumstances, [Cravens'] apparent belief that he could have inflicted even *more* damage had he hit Kauanui with his right hand is hardly exculpatory.

"Moreover, the jury could reasonably have found that [Cravens] secured himself every advantage to ensure that he could inflict the greatest possible injury on his victim. Not only was [Cravens] bigger and taller, but he gained extra inches of height for his punch by standing on the curb while Kauanui was at street level. [Cravens'] conduct thus guaranteed that Kauanui would fall on a very hard surface, such as the pavement or the concrete curb. 'The consequences which would follow a fall upon a concrete walk must have been known to [Cravens].' [Citations.]

"Perhaps worst of all, [Cravens] decked Kauanui with a sucker punch. The jury could reasonably have found that at the time [Cravens] attacked, Kauanui posed no threat and was not behaving in an aggressive manner. Nonetheless, [Cravens] 'came flying out' without warning and 'coldcocked' Kauanui. That [Cravens] used a sucker punch here—and, thus, that [Cravens] intended to catch Kauanui at his most vulnerable—was corroborated by his use of sucker punches in prior incidents, each of which the jury was allowed to consider as evidence of a common plan or scheme. [Citation.] The Court of Appeal not only failed to acknowledge that the fatal blow here was a sucker punch (or that it was inflicted with enough force to knock Kauanui unconscious before he even hit the pavement), but failed as well to grapple with the evidence tending to show [Cravens'] pattern of using sucker punches to his advantage." (*Cravens*, *supra*, 53 Cal.4th at pp. 508–509.)

The majority found the record also supports the jury's finding of the mental component of implied malice. (*Cravens*, *supra*, 53 Cal.4th at p. 511.)

14

It reasoned, "Of course, the jury was entitled to infer [Cravens'] subjective awareness that his conduct endangered Kauanui's life from the circumstances of the attack alone, the natural consequences of which were dangerous to human life. [Citation.] But [Cravens'] behavior before and after the fight further demonstrated that this was not, as [Cravens] suggests, a simple fistfight between friends. Before he arrived at Kauanui's house, [Cravens] was egging on Eric House and encouraging him to fight Kauanui, while dissuading others from sharing these plans with Kauanui. Then, having knocked Kauanui unconscious and with his head split open on the ground, [Cravens] took no steps to ascertain Kauanui's condition or to secure emergency assistance. Instead, he bragged about his own prowess, laughed and joked about Kauanui's condition (which 'didn't look good'), and expressed a willingness 'to come back at him if he had to.' These facts, too, bolstered the finding of implied malice." (*Ibid*.)

In his concurring opinion, Justice Liu discussed the two definitions of implied malice that had evolved from the case law. He explained that the Court had "previously acknowledged two lines of decisions that attempt to delineate the objective and subjective components of implied malice." (*Cravens, supra,* 53 Cal.4th at p. 512 (conc. opn. of Liu, J.).) The line of decision relied upon by the majority in its analysis articulates an implied malice murder as a " ' "killing [which] proximately resulted from an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*Ibid*.) The second line of authority provides that implied malice is shown when " 'the defendant for a base, antisocial motive and with wanton disregard for

15

human life, does an act that involves a high degree of probability that it will result in death.' " (*Ibid.*)

Justice Liu noted that these two "formulations" had been described as "equivalent" in the Court's prior decisions, and remarked that, in his view, the majority's failure to mention the " 'high degree of probability' test" suggested that it had become disfavored. (*Cravens, supra,* 53 Cal.4th at p. 514 (conc. opn. of Liu, J.).) He further stated, in his view, "the circumstances here fall just within the outer bounds of conduct sufficiently dangerous to satisfy the . . . test" that had been cited by the majority, i.e., " ' "an act, the natural consequences of which are dangerous to life." ' " (*Ibid.*)

Applying the substantial evidence standard, the California Supreme Court upheld Cravens' murder conviction based on a review of " 'the whole record in the light most favorable to the judgment.' " (*Cravens, supra,* 53 Cal.4th at p. 507.)

### III.

### *Petition for Resentencing*

In August 2021, Cravens filed a petition for resentencing under section 1172.6.[3] Section 1172.6 allows certain convicted defendants who could not have been convicted of murder under current law to petition retroactively to have their sentences vacated and to be resentenced to a shorter term of imprisonment.

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437) "significantly limited the scope of California's felony-

---

[3] Cravens filed his petition under former section 1170.95, which was renumbered to section 1172.6 effective June 30, 2022. (See Stats. 2022, ch. 58, § 10.)

16

murder rule and eliminated liability for murder under the natural and probable consequences doctrine through two key provisions." (*People v. Berry-Vierwinden* (2023) 97 Cal.App.5th 921, 930 (*Berry-Vierwinden*); Stats. 2018, ch. 1015, § 1, subd. (f).) "First, Senate Bill No. 1437 amended section 189 so that '[d]efendants who were neither actual killers nor acted with the intent to kill can be held liable for [felony] murder only if they were "major participant[s] in the underlying felony and acted with reckless indifference to human life[.]" ' [Citations.] Second, it amended section 188 to provide that, when the felony-murder rule does not apply, a principal in the crime of murder can only be convicted where he or she acted 'with malice aforethought,' and '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' " (*Berry-Vierwinden*, at p. 930.)

"Senate Bill No. 1437 also established a new procedure to allow defendants who could not have been convicted under current law to petition the sentencing court to vacate their murder conviction and resentence them on any remaining counts." (*Berry-Vierwinden*, *supra*, 97 Cal.App.5th at pp. 930–931.) Under section 1172.6, subdivision (b)(1), "[t]he process begins with the filing of a petition containing a declaration that all requirements for eligibility are met. [Citations.] If the defendant's petition is facially valid, the trial court is permitted to examine the record of conviction after appointing counsel to assess whether it refutes the petitioner's claim of eligibility. [Citation.] Under section 1172.6, subdivision (c), the court may deny the petition at the prima facie stage if the record of conviction discloses that the petitioner is ineligible for relief as a matter of law. [Citation.] Otherwise, the court must issue an order to show cause and hold an evidentiary hearing under section 1172.6, subdivision (d) to determine

17

whether to vacate the murder conviction, recall the sentence, and resentence the petitioner on any remaining counts." (*Berry-Vierwinden,* at p. 931.)

"One of the requirements for the prima facie showing is that the petitioner 'could not presently be convicted of murder or attempted murder because of changes to [s]ection 188 or 189' made by Senate Bill No. 1437." (*Berry-Vierwinden*, *supra*, 97 Cal.App.5th at p. 931; § 1172.6, subd. (a)(3).) "Accordingly, a court may deny the petition at the prima facie stage if the record of conviction conclusively establishes that the petitioner was convicted on a theory not affected by Senate Bill No. 1437." (*Berry-Vierwinden*, at p. 931.)

"Effective January 1, 2022, Senate Bill No. 775 (2020–2021 Reg. Sess.) (Senate Bill No. 775) amended section 1172.6.  As relevant here, the amendment expanded eligibility for resentencing to include not only those convicted of felony murder or murder under the natural and probable consequences doctrine, but also those convicted of murder under any 'other theory under which malice is imputed to a person based solely on that person's participation in a crime.' " (*Berry-Vierwinden*, *supra*, 97 Cal.App.5th at p. 931, quoting § 1172.6, subd. (a).)

"Senate Bill No. 775 further clarified the governing procedures for the prima facie hearing under section 1172.6, subdivision (c) and the evidentiary hearing under subdivision (d).  For a petition satisfying the basic pleading requirements, the court must appoint counsel, permit briefing, and conduct an initial hearing under subdivision (c) to determine whether the petitioner has made a prima facie case for relief, and if so, issue an order to show cause. (§ 1172.6, subds. (b)(3), (c).)  After issuance of an order to show cause, the court must conduct an evidentiary hearing under subdivision (d) to determine whether the petitioner is entitled to relief.  At the evidentiary hearing, the

18

burden is 'on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder' under California law as amended by Senate Bill No. 1437. (§ 1172.6, subd. (d)(3).)" (*Berry-Vierwinden, supra,* 97 Cal.App.5th at pp. 931–932.)

After reviewing Cravens' petition, which was filed in propria persona, the trial court ordered the appointment of counsel and set a briefing schedule to address whether he had made a prima facie case for relief. In March 2023, the court ruled that Cravens made the required showing and was entitled to an evidentiary hearing.[4]

The evidentiary hearing took place in December 2023. The parties jointly presented as an exhibit a complete copy of the record from Cravens' trial. The People did not present further evidence. Cravens elected to testify and did so remotely by Zoom.

According to Cravens, he was "good friends" with Kauanui and "best friends" with House. At the bar, House and Kauanui "got[ ] into it over a girl. They threw . . . beers at each other, [they] had to get separated multiple times, and they both got kicked out of the bar." Cravens got between them at one point and told them to "[c]alm down."

Cravens left the bar about 10 minutes after House was told to leave. Cravens, House, Yanke, Hendricks, and Osuna got into a car to take House home. But House spoke with Kauanui on the phone and decided he wanted to fight him. So the group drove House to Kauanui's house instead.

---

[4] The People contend the trial court erred when it made this ruling and this error constitutes an alternate ground for affirming the order dismissing the petition. We do not address this question because we conclude that Cravens' contentions on appeal lack merit and provide no basis for reversal in the first place.

When they arrived, Kauanui jumped over the front gate to his house. He and House then "rushed each other" and started fighting in the middle of the street. They were wrestling at first, but then "[Kauanui] got [House] in a . . . chokehold and was hitting him all the way from the middle of the street towards the curb" where they both wound up lying in the gutter with "their arms around each other's heads." House was "bleeding a lot."

A car suddenly came around the corner. It "screeched to a stop" and Grosso "jumped out." She "started trying to kick [House] in the head," but she missed him about "half of the time" and kicked Kauanui instead. Hendricks and Yanke both intervened and tried to persuade her to stop. They told her that Kauanui was "winning" the fight and House was "losing," and that everything was "all right." But she "went bonkers" and started screaming and honking the horn in her car. She ran to Yanke's car and "tried to kick the lights in." Cravens ran over to "subdue her."

At this point House and Kauanui had separated from one another. House was looking on the ground for his lost tooth. While he was trying to find it, Kauanui kept running back and forth and punching him in the face, "just drilling, boom, boom, like three or four times." Cravens "jumped" in between Kauanui and House and said to Kauanui, " 'Hey, he's done. He's done.' Like, 'Leave him alone. He's done.' " Cravens pushed Kauanui as he was saying this.

Cravens also tried to get House to leave, but House was "belligerent" because he wanted to stay and find his tooth. Cravens was "shocked" that Kauanui had beaten up House that quickly.

Grosso started screaming that Cravens and his friends were "not going to get away with this." They laughed at her because it was House who had lost the fight, not Kauanui. Cravens turned to ask Hendricks to stop Grosso

from "harassing" House while he was trying to find his tooth.  When he turned back around, Kauanui was standing right in front of him.

Kauanui said, "What?" to Cravens, and Cravens perceived this to be a challenge to fight.  Thinking Kauanui was about to punch him, Cravens punched him first with his left hand.  According to Cravens, Kauanui "stood there," and was "knocked out [on] his feet."  "His head was wobbling back and forth, and he was snoring while he was standing on his feet.  [Cravens] stepped out, to, like grab him, because [he] didn't know what was going on with him and he fell back and hit his head on the ground, and he was snoring really loud."  Cravens did not see blood coming from Kauanui's head, and "just thought he was knocked out."

Cravens believed Kauanui was a "tough guy."  He had seen him get hit twice in the head with a frying pan, win a fight with three "guys that were jumping him," and "knock people out after he got hit a bunch of times, and then go drink afterwards and laugh about it."  Cravens denied telling his friends, "Let's go fuck [Kauanui] up."

Cravens admitted Kauanui did not hit or punch him, saying, "[H]e had his hands in fists.  He didn't swing them.  He didn't punch me, no."  Cravens acknowledged he was standing on the curb when he punched Kauanui.  He admitted he told someone who called him that night, "if [Kauanui] comes at me again, I'll do it again," and that he told someone else, "I would hardly call it a fight.  I punched him out."  Cravens explained he made the statements before he knew Kauanui was in the hospital, saying, "I didn't know he got taken away in an ambulance."  When asked why he didn't just walk away when Kauanui stepped toward him and said, "What?," Cravens testified:  "I mean, if you're asking—you're asking me back then when that's how I solved all my problems.  I was 21, and I was ruled by, you know—the things that

I've learned in prison and things I know about myself now, I can tell you exactly why I did [that] then. I was fearful. I was scared of being embarrassed. I was scared of being thought less of. I was scared of backing down from people. All of those things."

After Cravens' testimony, the trial court heard several rounds of argument. Significant here, the People argued the petition should be denied for *two* reasons. *First*, the People asserted Cravens was ineligible to be resentenced. As discussed, pursuant to section 1172.6, subdivision (a)(1), to be eligible for resentencing, petitioners must establish they were prosecuted "under a theory of felony murder, murder under the natural and probable consequences doctrine, or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine." Cravens had persuaded the court at the initial prima facie hearing that the jury instructions at trial impermissibly allowed the jury to convict him on an aiding and abetting theory that imputed malice to him. At the evidentiary hearing, the People continued to assert the jury instructions did not permit conviction under any such theory and asked the court to reconsider its eligibility ruling in light of the complete trial record. They argued the court was required to deny Cravens' petition for this reason alone.

*Second*, pursuant to section 1172.6, subdivision (d)(3), the People asserted they met their burden at the evidentiary hearing "to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to [s]ection 188 or 189 made effective January 1, 2019." They asserted they met this burden with respect to all the elements they needed to prove, including the highly disputed element of implied malice.

22

In response, Cravens argued the trial court was prohibited from reconsidering its prior ruling that Cravens was prosecuted under a theory that allowed the jury to impute malice from participation in another crime, and, regardless, the ruling was correct and he was eligible for relief. In addition, he asserted the prosecution failed to prove beyond a reasonable doubt that he was guilty of murder under current law because the evidence was insufficient to (1) convict him under current law on a permissible theory of imputed malice, such as felony murder under the new definition, and (2) convict him on the theory he was an actual perpetrator and personally harbored implied malice when he punched Kauanui.

After hearing argument, the trial court denied the petition for resentencing. The court did not issue a written ruling. Its minute order states: "The [c]ourt denies [Cravens' petition]. The [c]ourt finds that [Cravens] is the actual killer, and the evidence presented to the [c]ourt, which is the full and complete copy of all trial record transcripts supports that he is the actual perpetrator." (Boldface omitted.)

## DISCUSSION

### I.

### *The Trial Court Properly Conducted an Independent Assessment of the Evidence*

Cravens contends the trial court erred by failing to act as an independent fact finder during the evidentiary hearing. The record does not support this contention. Absent evidence to the contrary, a reviewing court "presume[s] that the trial court knew the law and followed it." (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042 (*Ramirez*).) Cravens has not rebutted this presumption.

23

First, the plain language of section 1172.6 requires independent factfinding by the trial court at an evidentiary hearing on a petition for resentencing. Section 1172.6, subdivision (d)(3) expressly provides "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to [s]ection 188 or 189 made effective January 1, 2019." To the extent there may have been ambiguity about this express language in the past, amendments to section 1172.6 by Senate Bill No. 775 have "clarified that the trial court's role in a section 1172.6 proceeding is to act as an independent fact finder and determine, in the first instance, whether the petitioner committed murder under the law as amended by Senate Bill No. 1437." (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 123.) Section 1172.6, subdivision (d)(3), now specifically provides that "[a] finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." We presume the trial court did not overlook these express provisions. (*Ramirez*, *supra*, 10 Cal.5th at p. 1042.)

Second, the independent factfinding requirement that is set forth in section 1172.6, subdivision (d)(3), was *undisputed* during the underlying proceedings. Both parties repeatedly acknowledged the requirement of independent factfinding by the trial court as controlling law. To quote the prosecutor: "Your Honor, at this hearing, the [c]ourt . . . is the fact finder." "[N]ow that that imputation of malice is no longer an available theory for guilt, this [c]ourt as factfinder must reassess . . . with only that remaining theory available, is Mr. Cravens guilty of murder?" "This [c]ourt stands as the sole juror, the sole factfinder as to th[e] question, was there sufficient

24

evidence? . . . Was there evidence beyond a reasonable doubt to prove implied malice in this matter?" "I ask that the [c]ourt deny this petition and find that this petitioner is guilty beyond a reasonable doubt of murder with implied malice as a direct perpetrator in this case, and as such, deny his petition for resentencing."

To quote defense counsel: "At the instant evidentiary hearing, this court must make 'an independent analysis of the record and evidence before finding defendant guilty of murder under current law.' [Citation.] The court's findings must be beyond a reasonable doubt and '[i]f the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.' [Citations.] The court is not bound by the jury's findings (except in case of acquittal or 'not true' findings), and the court is not limited to reviewing the jury's verdicts." "The standard in the trial court is not sufficiency of the original evidence, and a conclusion that guilt can be rationally inferred from substantial evidence is not enough to support denial."

Third, the trial court read the independent factfinding requirement *out loud* during the hearing when it asked defense counsel whether Cravens would be presenting new evidence. The court specifically acknowledged that it would be conducting an "independent analysis of the trial record and the new evidence that w[ould] be submitted to the [c]ourt."

Finally, the ruling itself contains no indication the trial court misunderstood the law. The court began by quoting from the reply brief Cravens filed in response to the People's return to the order to show cause. As noted, the People had argued the petition should be denied for two reasons. First, they urged the court to revisit its prima facie ruling that

25

Cravens was eligible to be resentenced and rule that he was in fact ineligible because the jury instructions did not permit conviction under an imputed malice theory. Second, they argued the court, as an independent factfinder, should find they met their burden to prove, beyond a reasonable doubt, that Cravens was guilty of murder on a theory permitted after changes to sections 188 and 189. The court therefore needed to make clear which of the two reasons was the basis for its decision. The quoted material makes it clear the court was denying the petition based on a finding that the People satisfied their burden of proving Cravens was guilty of murder pursuant to section 1172.6, subdivision (d)(3), and not on the People's alternate contention that he was ineligible to be resentenced pursuant to section 1172.6, subdivision (a)(1).

The trial court quoted from the pleading's introduction where Cravens argued the People would not be able to prove he was guilty of murder at the evidentiary hearing, neither on an imputed malice theory under current law, nor on the theory he was the actual perpetrator and personally harbored implied malice:

> Regardless of whether [Cravens'] act was a proximate cause of Kauanui's death,[5] [Cravens'] murder conviction cannot stand because it lacks a felony murder basis for guilt, and the prosecution cannot prove he acted with actual or implied malice.

The court then quoted from the pleading's conclusion where Cravens asserted the People would not be able meet their burden at the evidentiary hearing of

---

5    By this statement, we understand Cravens to be referring to the " 'group attack' " theory he asserted improperly imputed malice in violation of sections 188 and 189.

demonstrating, pursuant to section 1172.6, subdivision (d)(3), that he could be convicted under current law:

> Because he could not be convicted of murder, this court must vacate the murder conviction, sentence him on an appropriate underlying offense, and resentence him accordingly.

The court then denied the petition, stating:

> *I do not agree with that conclusion.* I think that's not correct based on the factual and legal basis for the conviction.
>
> So [the] petition is denied. Sentence will remain as earlier pronounced. (Italics added.)

The prosecutor asked for clarification, and the trial court explained its ruling was based on a finding that Cravens was the actual perpetrator and acted with implied malice, not felony murder or other theory of imputed malice:

> He was the actual killer. And the evidence amply supports the finding of required malice.
>
> [¶] … [¶]
>
> *I think* that clearly he was the actual perpetrator. And the record, *I think*, equally supports the finding that he acted with implied malice. (Italics added.)

We see nothing about this ruling to suggest the trial court improperly assessed the evidence of guilt using a substantial evidence standard instead of independently reviewing it. To the contrary, the court used the first person when explaining its ruling. The court also referred the parties to the introduction and conclusion of Cravens' reply brief. Both sections of his brief identify the correct standard for assessing the evidence. The introduction provides:

27

[Cravens'] murder conviction must now be vacated if [he] cannot be proven guilty beyond a reasonable doubt of acting with personal malice[,] whether implied or actual. During the court's *independent analysis* of the trial record and the new evidence that will be submitted, the court will find that the prosecution cannot prove its case. (Italics added.)

The conclusion provides:

Upon conducting its *independent analysis*, this court should conclude that the unfortunate and unforeseeable death of Kauanui does not prove beyond a reasonable doubt that [Cravens] committed a life endangering act with knowledge that it carried a high risk of death. Rather, his action had an unexpected and unintended result that no reasonable person would have foreseen, and more importantly, which [Cravens] himself did not foresee. Indeed, [Cravens'] youthful impulsivity, and his own history of assaults made him unaware that this level of harm would happen. He is guilty of felony assault causing [great bodily injury], or at most, voluntary manslaughter. (Italics added.)

Cravens seizes on the two statements the trial court made in response to the prosecutor's request for clarification:

He was the actual killer. And the evidence amply supports the finding of required malice.

[¶] … [¶]

I think that clearly he was the actual perpetrator. And the record, I think, equally supports the finding that he acted with implied malice.

He claims these statements "suggest" the trial court improperly reviewed the jury's verdict for substantial evidence instead of independently determining Cravens could be found guilty of murder under current law. In his view, the word choice in the statements—that the evidence in the record " 'supports the finding' " of implied malice—is "an apparent reference to the jury's verdict," and "is the language of substantial evidence review." Cravens complains "the

28

trial court never mentioned the " 'beyond a reasonable doubt' " standard much less expressly found beyond a reasonable doubt that Cravens was the actual perpetrator. He argues, "[t]aken together, the trial court's statements suggest that the trial court mistakenly viewed its task as determining whether Cravens was convicted as the 'actual perpetrator' and, if so, whether the evidence 'supports the finding' that the jury must have therefore made regarding implied malice." We disagree and decline to jump to conclusions in this manner.

"[A] court's 'failure to "discuss" a particular standard does not imply it applied an incorrect standard. Error on appeal must be affirmatively shown by the record, and "[w]e presume the trial court knew and properly applied the law absent evidence to the contrary." ' " (*People v. Johnson & Johnson* (2022) 77 Cal.App.5th 295, 322.) Here, it is true the trial court's statements do not say the record "supports *my* finding *beyond a reasonable doubt* that Cravens acted with implied malice." But the statements also do not say the record "supports *a* finding *of substantial evidence sufficient to persuade a reasonable factfinder* that Cravens acted with implied malice." We do not presume error under these circumstances. We are required to do the opposite and presume the court did not err. (*Ramirez, supra*, 10 Cal.5th at p. 1042.) Indeed, the rule that we do not make this kind of presumption is especially apt here, where the trial court's statements were made on the fly in response to a request by the prosecutor to clarify an entirely different point.

Finally, at oral argument, Cravens' appellate counsel asserted the prosecutor repeatedly misstated the law during the evidentiary hearing, alleging the prosecutor argued to the trial court "multiple times" that it should rule against Cravens because the jury had already made a determination beyond a reasonable doubt on the question of implied malice.

We have reviewed appellate counsel's citations to the record and find no such misstatement. In each instance, the prosecutor was clearly arguing the People's first theory for denying the petition, i.e., that he was ineligible for resentencing in the first place because the jury was never instructed on a theory that allowed the imputation of implied malice. As noted, when arguing the People's second theory, i.e., that they sustained their burden of proof at the evidentiary hearing, the prosecutor repeatedly recited the correct standard: proof beyond a reasonable doubt based on an independent review by the court. We see no basis for inferring the court was confused by the prosecutor's discussion of the two bases she asserted for denying the petition.

In any event, there was no need to read tea leaves here in the first place. The independent, beyond-a-reasonable-doubt standard was undisputed and repeatedly discussed by both parties. The trial court pinpointed a pleading that described the correct standard as part of its ruling. And the court read the correct standard out loud on the record at one point during the proceedings. Cravens has failed to demonstrate the trial court erred by failing to act as an independent fact finder during the evidentiary hearing.

## II.

*Substantial Evidence Supports the Trial Court's Ruling*

Cravens contends his resentencing petition should have been granted because the evidence presented by the prosecution at the evidentiary hearing was insufficient to support a finding of implied malice, and therefore insufficient to demonstrate he could be convicted of murder under current law. We disagree. The evidence of implied malice was sufficient to support the trial court's ruling.

A trial court's denial of a section 1172.6 petition is reviewed for substantial evidence unless the court misunderstood the elements of the applicable offense. (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).) "Under this standard, we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*Ibid.*) " ' " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' " (*Cravens, supra*, 53 Cal.4th at p. 508.)

"Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*Reyes, supra,* 14 Cal.5th at p. 988.) "To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[ ] a high degree of probability that it will result in death." ' " (*Id.* at p. 989.) California has "long recognized 'that an assault with the fist ... may be made in such a manner and under such circumstances as to make the killing murder.' " (*Cravens, supra,* 53 Cal.4th at p. 508, quoting *People v. Munn* (1884) 65 Cal. 211, 212.)

Based on our independent review of the record, the evidence adduced at the evidentiary hearing was sufficient to support a finding beyond a reasonable doubt of both the objective and subjective components of implied malice. As a starting point, based on the original trial court record, we agree

with our high court's conclusion that the evidence of implied malice presented at Cravens' trial was sufficient to support his original conviction on a theory where he was the actual perpetrator. We have quoted the Court's analysis at length and Cravens does not contend otherwise.

Our review of the additional evidence presented at the evidentiary hearing—Cravens' testimony—does not change our opinion about the sufficiency of the evidence under current law, which has not changed for actual perpetrators. Although Cravens' self-defense testimony aligned for the most part with testimony by his friends, it contradicted testimony by Grosso and Kauanui's neighbors. The trial court was entitled to reject Cravens' version of events, and its ruling suggests that it did. On review for substantial evidence, we presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).) "In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 640.)

Cravens asserts "the question of whether there was sufficient evidence to support a finding of implied malice on direct appeal was exceedingly close." He contends that "changes in the law and the evidence that have occurred in the interim tilt the balance and place this case outside of the outer bounds of what is necessary to sustain a finding of implied malice." We are not persuaded.

32

First, Cravens contends that evidence of two prior assaults was inadmissible at the resentencing hearing because the prosecutor charged him with assault but failed to obtain a conviction. He fails to acknowledge this question was raised in limine before the evidentiary hearing began, and his counsel conceded the evidence was admissible.

Second, based on "significant changes in the law relating to the culpability of defendants who were young adults in their teens or early 20s at the time of their crimes," Cravens contends the balance has tipped in favor of finding insufficient evidence he harbored implied malice. (*People v. Jimenez* (2024) 103 Cal.App.5th 994, 997.) These changes to the law, however, took place before the evidentiary hearing. (See *People v. Pittman* (2023) 96 Cal.App.5th 400, 416–418.) There is no evidence the trial court was unaware of these changes. To the contrary, Cravens affirmatively argued they should be taken into consideration. We presume the court did so. (*Ramirez, supra,* 10 Cal.5th at p. 1042.) But, of course, the court was entitled to reject Cravens' testimony that his youth influenced his behavior to the point where he cannot be said to have harbored implied malice when he killed Kauanui. The court was entitled to do so on credibility grounds, and also in the face of conflicting inferences that can be drawn from Cravens actions. We defer to the trial court in the face of conflicting inferences and questions about witness credibility. (*Albillar, supra,* 51 Cal.4th at p. 60.)

Finally, Cravens asserts the California Supreme Court "clarified" the definition of implied malice in *Reyes*, *supra*, 14 Cal.5th 981. Our review for substantial evidence is based on current law. We have considered both of our high court's articulations of the objective and subjective components of implied malice. We have taken note that the two "formulations" have been described as equivalent. (*Cravens, supra,* 53 Cal.4th at p. 514 (conc. opn. of

33

Liu, J.).) And we have taken note in particular that, "[t]o suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "[i]nvolve[ ] a high degree of probability that it will result in death." ' " (*Reyes*, at p. 989.)

On this question, we highlight testimony by two witnesses at Cravens' trial about the power behind Cravens' punch and the velocity of Kauanui's headfirst fall to the ground. First, Baltazar had a bird's eye view of the confrontation from his second story balcony that "look[ed] directly down to the street." He saw four men "just whaling" on Kauanui. The men were "kicking and pounding and slugging." "[S]omehow . . . , [Kauanui] was able to right himself up . . . . [¶] And at that point[,] . . . out . . . from where [a] car was parked[,] someone who was wearing a black baseball cap, a black opened shirt, short-sleeve shirt, black shorts, black shoes and white socks came *flying out* . . . and coldcocked [him]. And that's when [Kauanui] went down onto the ground." (Italics added.) "[Y]ou could hear the doosh of his skull hitting the ground."

Second, Stanley, the medical examiner who conducted Kauanui's autopsy, testified she had not seen the kind of injuries to Kauanui's skull from "a simple accidental fall." She agreed, "there must have been some velocity associated with the application of force" to have caused the injuries she observed, and she agreed Kauanui's injuries were "consistent with being punched by somebody coming off at a greater height downward and *propelling* him back into the concrete." (Italics added.) She explained, "I've seen these sort of injuries in motor vehicle crash cases [and where] people . . . have been impacted with some sort of instrument, hammer, baseball bat, tire iron."

34

On these facts, a trier of fact could readily conclude the punch delivered by Cravens was a truly singular one that unquestionably carried a high probability of fatal injuries.  A trier of fact could also easily conclude the high risk of death would be self-evident to anyone, including Cravens.  (See *People v. Alexander* (1923) 62 Cal.App. 306, 308–309 [upholding a second degree murder verdict where the defendant would have known that "fatal injuries would result from the striking of his head upon the hard pavement"]; *People v. Efstathiou* (1941) 47 Cal.App.2d 441, 443 [upholding a second degree murder verdict where "[t]he consequences which would follow a fall upon a concrete walk" must have been known to the defendant].)  Based on the entire record at the evidentiary hearing, but in particular based on the salient testimony by these two witnesses about the power and momentum behind Cravens' sucker punch, we conclude there was sufficient evidence adduced at the evidentiary hearing to support a finding beyond a reasonable doubt that Cravens harbored implied malice when he punched Kauanui in the face with no warning and propelled him headfirst into a concrete roadway.

## DISPOSITION

The order denying Cravens' petition for resentencing is affirmed.

DO, Acting P. J.

I CONCUR:

KELETY, J.

35

Buchanan, J., Concurring.

I concur in the judgment solely on the ground that Cravens failed to make a prima facie showing of eligibility for relief under section 1172.6, subdivision (c).

The complete record of conviction from the 2008 trial conclusively demonstrates Cravens is ineligible for relief because the jury was not instructed on either felony murder or the natural and probable consequences doctrine, and the jury could not have convicted him on any theory of imputed malice. (§ 1172.6, subd. (a).) To the contrary, the record establishes that the jury could only have convicted Cravens as the direct perpetrator of implied malice murder who personally inflicted the fatal blow. It was undisputed at trial that Cravens threw the sucker punch that caused Kauanui to fall and hit his head against the pavement, fracturing his skull and resulting in his death. There was no evidence that Cravens aided and abetted someone else who perpetrated the fatal blow. At oral argument, defense counsel conceded there was no "serious dispute about the actual perpetrator . . . in terms of who struck the fatal blow . . . ."

Where undisputed facts in the record of conviction demonstrate that the petitioner was the direct perpetrator of the murder, and the petitioner "points to [no] specific facts that identify someone else as the direct perpetrator," a "hypothetical alternate direct perpetrator cannot be conjured from thin air or a legal conclusion." (*People v. Patton* (2025) 17 Cal.5th 549, 567 (*Patton*).) Moreover, at the prima facie stage, a court does not engage in impermissible factfinding by relying on undisputed facts from the record of conviction to refute a petitioner's conclusory allegations of eligibility. (*Id.* at pp. 565–566; see also *id.* at p. 564 [court may "rely on unchallenged[] relief-foreclosing facts" from record of conviction "to refute conclusory, checkbox

allegations" of eligibility for relief at prima facie stage]; *People v. Glass* (2025) 110 Cal.App.5th 922, 929–930 [following *Patton* in finding petitioner ineligible for relief at prima facie stage based on his sworn statements in plea form and at plea hearing].)  Because the record of conviction here demonstrates as an undisputed fact that Cravens himself inflicted the fatal blow and was therefore a direct perpetrator of the murder, he is ineligible for relief under section 1172.6.  (*Patton*, at pp. 564–569.)

In arguing he made a sufficient prima facie showing, Cravens relies primarily on *People v. Langi* (2022) 73 Cal.App.5th 972.  *Langi* held that a petitioner convicted of second degree murder was eligible for relief under section 1172.6 because the aiding and abetting instruction given at his trial (CALCRIM No. 401) permitted the jury to convict him as an aider and abettor on a theory of imputed malice.  (*Langi*, at pp. 980–984.)  As Cravens notes, the same instruction was given at his trial.  In *Langi*, however, there was a factual dispute over which of several assailants threw the fatal punch.  (*Id*. at p. 980.)  Such a factual dispute over the defendant's role cannot be resolved at the prima facie stage.  (*Patton, supra*, 17 Cal.5th at p. 567.)  Here, by contrast, there was no such factual dispute and no basis for the jury to find that someone other than Cravens was a direct perpetrator of the murder. Although others were involved in the fight, it was undisputed that Cravens himself committed the life-endangering act that caused Kauanui's death. Even assuming *Langi* was correctly decided, therefore, its reasoning would not apply here.  Based on the undisputed facts and the jury instructions

2

given, the jury could not have found Cravens guilty of murder as the actual perpetrator of the fatal blow by imputing someone else's malice to him.[1]

Because I believe the petition should have been denied for failure to make a prima facie showing of eligibility under section 1172.6, subdivision (c), I would not reach the other issues relating to the trial court's ruling on the merits under subdivision (d).

BUCHANAN, J.

---

[1] The jury instructions defined the "perpetrator" as the person who "directly committed the crime." They further stated that someone has committed the crime of murder if he "committed an act that caused the death of another person" and did so with "malice aforethought." Moreover, the aiding and abetting instructions required that a "perpetrator committed the crime" and the aider and abettor aided, facilitated, promoted, encouraged, or instigated "the perpetrator's commission of that crime." The jury instructions did not permit a murder conviction against the person who committed the act causing death if he acted *without* malice but someone else aided and abetted him *with* malice.

3